723 A.2d 494

**Donald Kent WILSON**

v.

**STATE of Maryland.**

No. 401, Sept. Term, 1998.

Court of Special Appeals of Maryland.

Jan. 27, 1999.

**544**

Mark Colvin, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Celia Anderson Davis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Walter B. Dorsey, State's Atty. for St. Mary's County of Leonardtown, on the brief), for appellee.

Submitted before HOLLANDER, SONNER and THEODORE G. BLOOM, (Retired, Specially Assigned), JJ.

HOLLANDER, Judge.

Donald Kent Wilson, appellant, was convicted by a jury in the Circuit Court for St. Mary's County of driving under the influence of alcohol ("DUI") and making an unsafe lane change.[1] Wilson was sentenced as a second offender to one year of incarceration, with work release. For purposes of sentencing, the court merged the unsafe lane changing conviction with the DUI offense. On appeal, appellant presents two issues:

---

1. The jury acquitted appellant of the offense of driving while intoxicated. Moreover, at the end of the State's case, the court granted a motion for judgment of acquittal as to driving in violation of a driver's license restriction.

I.   Did the trial court err in permitting the arresting officer to testify that, based on the results of a horizontal gaze nystagmus test, he believed that appellant was "intoxicated" and that his blood alcohol content was "probably point one zero or higher"?

II.  Was appellant improperly sentenced as a second offender?

We answer the first question in the affirmative. Therefore, we shall reverse the judgment of conviction for the DUI offense only, and remand for further proceedings. In light of our disposition, we need not consider the second issue.

## FACTUAL SUMMARY

Early on the morning of May 31, 1997, Trooper Roger Redmond was on routine patrol, traveling westbound on Maryland Route 246, near Lexington Park. At approximately 1:30 a.m., a Ford pick-up truck caught the trooper's attention. The truck, which was traveling westbound on Route 246, was in lane number one, which the trooper also referred to as the left and the fast lane. The truck made an "abrupt jerk to the right," as if it were changing lanes. When the truck was partly in lane number two, also referred to as the slow or right lane, it drifted back into the left lane. After that, the truck made another "erratic" lane change into the right lane, without signaling, nearly striking the curb. In describing the movement of the truck, Trooper Redmond said it was "as if to avoid an animal, for example . . . very quick, erratic."

Based on his observations, Trooper Redmond determined to follow the truck in his marked patrol vehicle. Without accelerating, the trooper gained on the truck, which was traveling below the posted speed limit. When Trooper Redmond was within several feet of the truck, it made another erratic lane change into the left lane. In doing so, the truck nearly struck the front of the police car. Trooper Redmond then pulled the truck over to a parking lot and approached the vehicle, which had two occupants.

Appellant was identified as the driver of the truck. Steven Gingery was the passenger in the vehicle. Trooper Redmond advised appellant that he stopped the truck because of the erratic lane change and asked him for his license and registration. The trooper noticed that appellant was "very clumsy, very slow with his movements." Although appellant's driver's license was visible in his wallet, appellant "fumbled" and flipped past it. After twenty to thirty seconds, Trooper Redmond pointed out the license to appellant, who "clumsily" removed it.

The trooper detected a "very strong" odor of alcohol and asked appellant if he had been drinking. Appellant did not respond. As appellant stepped out of the truck, however, Trooper Redmond determined that the odor of alcohol was coming from appellant. The trooper acknowledged that although appellant was "very slow with his movements," he did not "fall over" when he exited his vehicle.

Trooper Redmond wanted appellant to perform three field sobriety tests while on the level, paved parking lot. The first was the horizontal gaze nystagmus ("HGN") test. The police officer explained that it is used to evaluate certain involuntary, jerking optical movements, indicative of one's alcohol content. Over objection, Trooper Redmond was qualified as an expert in administering and evaluating the results of the HGN test. The following colloquy is relevant:

**THE COURT:**

(At the bench) You are saying he is certified in administering this test. You need to lay some more foundation as to exactly what you went into as far as —— I think he has testified that he is certified in the test. You need to determine whether or not he is certified, that allows him to not only administer the test but to also interpret the results of the test. You need to get into a little bit of that before I allow you to talk about what it means.

**PROSECUTOR:** Okay.

(Open court)

Officer, let's back up for a minute to the training you received from the Maryland State Police with regard to the HGN. You were trained to administer the test, correct?

**REDMOND:** Yes, ma'am.

**PROSECUTOR:** And certified to administer it?

**REDMOND:** Yes, ma'am

**PROSECUTOR:** Were you trained to interpret the results of the test?

**DEFENSE COUNSEL:** I would object.

**THE COURT:** Overruled.

**REDMOND:** Yes, ma'am, we were trained to a certain extent as to how to interpret the results. We were given an accuracy, a point of accuracy I should say in the interpretation that if there is an nystagmys [sic] present, that the number I believe was between 70 and 80 percent accurate with that test alone, with no other test alone. Horizontal gaze-nystagmys [sic] would be 70 to 80 percent accurate on its own.

**DEFENSE COUNSEL:** I would object and move that that be stricken.

**THE COURT:** Overruled.

**PROSECUTOR:** Officer, were you—you were taught to interpret these results; is that correct?

**REDMOND:** Yes, ma'am.

**PROSECUTOR:** And in fact you were—did you actually have to perform this test on various subjects who had already been determined, previously determined to be at various levels of intoxication?

**REDMOND:** Yes, ma'am.

**PROSECUTOR:** In fact, that is what the certification is all about?

**REDMOND:** Yes, ma'am.

**PROSECUTOR:** Tell the jury what it is exactly that you have to do to get certified[.]

**DEFENSE COUNSEL:** Objection.

**THE COURT:** Overruled.

**REDMOND:** What we do at the Maryland State Police Academy for this particular part of the course. There are several summer troopers, some are troopers, some are civilian employees of the state of Maryland. They come to the State Police headquarters where our training is conducted. Each is administered a certain amount of an alcoholic beverage. The alcohol content of their blood is predetermined by such means as PBT's and other instruments which we use to measure alcohol content of someone's blood. We administer these field sobriety tests to these test subjects. We are not told ahead of time what their alcohol level is. *We must try to determine whether or not this person is intoxicated based on the field sobriety tests we were taught to administer to them.*

**PROSECUTOR:** And is there a certain level of accuracy you have to achieve before you are passed and certified in the testing?

**REDMOND:** Yes, ma'am, I believe we were one hundred percent accurate in each and every subject.

**PROSECUTOR:** Is that what you had to be to be certified?

**REDMOND:** I'm not sure that you had to be, but I know that I was.

**DEFENSE COUNSEL:** I object and ask that it be stricken.

**THE COURT:** Overruled.

**PROSECUTOR:** At this time I would like to ask the court to qualify the witness as an expert in the administration of the [HGN] test and the interpretation based on his training in this matter.

I would also ask the court to take judicial notice of the scientific reliability of the test as stated in ... Schultz versus State.

\*　　\*　　\*

**THE COURT:** Is there any objection?

**DEFENSE COUNSEL:** Yes, Your Honor.

**THE COURT:** The court will find that the witness is an expert in the administering and also evaluating the results of the horizontal gaze-nystagmys [sic] test and allow him to give opinions concerning that particular test over objection.

*       *       *

**PROSECUTOR:** Officer, based on your administration, in your training on the area of administrating and evaluating the results of tests, and based on your observations of the defendant's results in that test that night, *do you have an opinion as to some—as to some degree of accuracy of his level of intoxication?*

**REDMOND:** Yes, ma'am, I do believe that the defendant was -

**DEFENSE COUNSEL:** I would object.

**THE COURT:** Overruled.

**PROSECUTOR:** What is that opinion, officer?

**REDMOND:** *I believe that he was driving while intoxicated. That his blood alcohol content was probably point one zero or higher.*

**DEFENSE COUNSEL:** I would object and move that it be stricken.

**THE COURT:** Overruled.

(Emphasis added).

The trooper testified that he performed three separate components of the HGN test. Using a maglight for illumination, the trooper asked appellant to follow the trooper's fingertip as it passed left to right in front of appellant's eyes. According to the trooper, "[t]he eye should be able to follow without any type of erratic movement." Trooper Redmond claimed that, unlike normal eyes, appellant's eyes were unable to follow the light without erratic movement. Instead, as appellant's eyes followed the light, the trooper observed that they were "very jerky and erratic." The trooper also held the light to appellant's left side, "approximately 45 degrees from the center line," and asked appellant to watch his finger. As

appellant did so, his eyes "were jerking erratically left to right." Appellant's eyes "were moving left to right in a jerking fashion." The trooper "pass[ed] the light, not quite out to the maximum of 45 degree deviation of [appellant's] eyes, [and] stop[ped] just before that." He detected "[a] nystagmus [i.e., "involuntary jerking"] present in both eyes prior to the maximum 45 degree deviation."

Trooper Redmond also asked appellant to perform the walk and turn test, which the trooper demonstrated for the jury. Appellant was instructed to walk and count out nine steps on a straight line, then turn around and come back. Appellant indicated he understood, but "mumbled" something "about one of his legs hurting." Although Trooper Redmond did not "follow" what appellant said, he did not notice any physical disability. Trooper Redmond further testified that, during this particular test, appellant stepped off the line on each step, took more than nine steps while counting them off as nine, and was unable to keep his heel and toe together. Nevertheless, Wilson "stayed fairly balanced."

The final test involved standing on one foot. When Trooper Redmond explained this test to appellant at the scene, Wilson said: "I can't do that." Consequently, Trooper Redmond did not administer the test.

Based on his experience in administering and evaluating the HGN test and his observations of appellant's performance, Trooper Redmond opined, over objection, that appellant had been driving while intoxicated and that his blood alcohol content ("BAC") was "probably point one zero or higher." Trooper Redmond acknowledged, however, that some prescription medications can cause similar HGN results, and appellant had told the trooper that he was taking a prescription drug for his colon. Further, the trooper testified that, based on his training and experience, along with his observations of appellant's driving and Wilson's "personality that evening," appellant was, in his opinion, driving while intoxicated.

The defense called two witnesses. The passenger, Gingery, testified that he and appellant had been together since 6:00 p.m. After the two men got together, Gingery asked appellant to stop for beer. Gingery claimed that he had been drinking "continuously" the entire evening, but appellant did not have anything alcoholic to drink. The men were on the way to visit a friend when they were stopped by Redmond.

Gingery further testified that shortly before they were stopped by Trooper Redmond,

I told Mr. Wilson that we were going to be turning up ahead. I assumed he thought we would be taking a left hand turn, so he started to make a lane change. I said, no, we will be turning right, so he came back over. That is where the officer was when we were coming back into our lane.

Appellant testified that he had not had anything alcoholic to drink that evening. He attributed his performance on the sobriety tests to several factors: the medication he was taking for two medical conditions, which caused dizziness; a leg injury sustained in an accident, which was not apparent but which affected his balance; and he was tired, because he had been awake since 4:00 a.m. the previous day. Appellant also testified that he was not familiar with the area where he was stopped and that Gingery, who was directing him, "kept saying it was there, turn, that turn."

In his instructions to the jury, the court closely followed Instruction 4:10 from the Maryland Criminal Pattern Jury Instruction ("MPJI–Cr."),[2] stating:

Now, definitions of the crimes charged in this case. Driving while intoxicated and driving under the influence of alcohol. The defendant is charged with the crime of driving under the influence of alcohol. In order to convict the defendant, the State must prove beyond a reasonable doubt,

2. The court did not instruct the jury in accordance with MPJI–Cr. 4:10.2, concerning blood or breath tests that measure blood alcohol content.

one, that the defendant drove, operated, moved or was in actual physical control of the vehicle, and, two, at the time the defendant was either intoxicated, or under the influence of alcohol.

The distinction between driving while intoxicated and driving under the influence of alcohol is one of degree. A person is under the influence of alcohol when the alcohol that he has consumed has impaired normal coordination, although not amounting to intoxication. Another way of saying this is the person's acts have been reduced or weakened by the consumption of alcohol.

Intoxication means more than being under the influence of alcohol. A person is intoxicated when the alcohol that he has consumed has substantially impaired normal coordination.

We will include additional facts in our discussion.

### *Discussion*

In his brief, appellant acknowledges that he "does not challenge the trooper's description of his performance on the HGN test." Nor does he quarrel with the officer's qualifications to administer the HGN test. Instead, appellant complains that the trial court erroneously admitted Trooper Redmond's testimony quantifying appellant's blood alcohol content on the basis of the HGN test results. Relying on *Schultz v. State*, 106 Md.App. 145, 664 A.2d 60 (1995), and the decisions of other state courts, appellant contends that HGN testing is "admissible to show the presence of alcohol in a defendant," but it "is not admissible to establish blood alcohol content." Thus, appellant quarrels with the trooper's opinion testimony concerning appellant's "level of intoxication;" the trooper testified: "I believe that . . . [appellant's] blood alcohol content was probably point one zero or higher." Further, he argues that there was, "at the very least, a reasonable possibility" that Trooper Redmond's testimony "contributed to the jury's verdict" of guilty as to the DUI charge.

The State counters that the trial court properly admitted the trooper's testimony under Md. Rule 5–702,[3] which governs expert witnesses. Moreover, it posits that Wilson was not harmed, because the jury acquitted him of driving while intoxicated, which was the charge for which the State introduced the testimony in question.

In our view, the court erred in permitting Trooper Redmond to testify that, based on the HGN test results, he believed appellant's blood alcohol content was "probably point one zero or higher." Although the trooper was qualified to administer the HGN test and, to that extent, was properly received as an expert, HGN testing may not be used to establish a specific blood alcohol level. Indeed, as the lengthy colloquy that we quoted earlier makes plain, the State never sought to establish that the trooper's expertise in administering the HGN test included the ability to determine specific blood alcohol content based on the HGN test results. The HGN test is a type of field sobriety test, but it is not the equivalent of laboratory chemical analysis of blood, breath, or urine.

In *Schultz, supra*, 106 Md.App. 145, 664 A.2d 60, we addressed the admissibility of HGN testing generally. There, the defendant was convicted of DUI after the police officer testified about appellant's performance of the HGN test. After reviewing the scientific literature and case law from other jurisdictions, we took "judicial notice that the results of HGN testing, if the test is properly given by a qualified officer, are admissible to indicate the presence of alcohol in a defendant." 106 Md.App. at 174, 664 A.2d 60. Further, we held that "the

---

**3.** Maryland Rule 5–702 provides:

Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

results of HGN testing are admissible in evidence in the courts of this State, provided the administrator of the test is duly qualified and the testing procedure is conducted properly." *Id.* at 151, 664 A.2d 60. Because the record did not reflect that the officer was properly trained or certified to administer the test, however, we reversed Schultz's convictions for the alcohol related offenses. *Id.*

In our review of *Schultz*, we find no intimation by the Court that even when, as here, a police officer is qualified to administer an HGN test, the officer may also opine about specific blood alcohol content based on the HGN test. Other courts that have addressed this issue have overwhelmingly concluded that evidence of HGN testing is not admissible to establish a specific blood alcohol content.

In *State v. Superior Court (Blake)*, 149 Ariz. 269, 718 P.2d 171 (1986), for example, the Arizona Supreme Court concluded that HGN test results are not admissible as evidence of specific blood alcohol content. It stated:

> We find that the horizontal gaze nystagmus test properly administered by a trained police officer is sufficiently reliable to be a factor in establishing probable cause ... [,] satisfies the *Frye* test for reliability and may be admitted in evidence to corroborate or attack, but not to quantify, the chemical analysis of the accused's blood alcohol content. *It may not be used to establish the accused's level of blood alcohol* in the absence of a chemical analysis showing the proscribed level in the accused's blood, breath or urine.

718 P.2d at 182 (emphasis added).

Subsequently, in *State ex rel. Hamilton v. City Court (Lopresti)*, 165 Ariz. 514, 799 P.2d 855 (1990), the Arizona Supreme Court reiterated that HGN test results are inadmissible to establish BAC, in the absence of a chemical analysis of blood, breath, or urine. The court said:

> We clarify and reemphasize here that *HGN test results,* although satisfying *Frye* for limited purposes, *are inadmissible to estimate BAC in any manner,* including estimates of BAC over .10%, in the absence of a chemical analysis of

blood, breath, or urine. In the absence of a chemical analysis, *the use of HGN test results, as with observations from other field sobriety tests, is to be limited to showing a symptom or clue of impairment....* The officer may not testify regarding accuracy in estimating BAC from the test, nor may the officer estimate whether BAC was above or below .10%. The officer's testimony is limited to describing the results of the test and explaining that, based on the officer's experience, the results indicated a neurological impairment, one cause of which could be alcohol intoxication.

799 P.2d at 857–58 (emphasis added; footnote omitted). Further, the court concluded:

*HGN test results may be admitted only for the purpose of permitting the officer to testify that, based on his training and experience, the results indicated possible neurological dysfunction, one cause of which could be alcohol ingestion.* The proper foundation for such testimony, which the State may lay in the presence of the jury, includes a description of the officer's training, education, and experience in administering the test and a showing that the test was administered properly. *The foundation may not include any discussion regarding the accuracy with which HGN test results correlate to, or predict, a BAC of greater or less than .10%.*

*Id.* at 860 (emphasis added).

The Court of Appeals of Alaska recently reached the same conclusion in *Ballard v. State,* 955 P.2d 931, 940 (Alaska Ct.App.1998). It ruled:

For these reasons, we conclude that HGN evidence meets the *Frye* standard for admission of scientific evidence if the test results are admitted *for the limited purpose of establishing that a person has consumed alcohol* and is therefore potentially impaired. While HGN testing may not, of itself, be sufficient to establish intoxication, *HGN test results are admissible as a factor to be considered by the fact-finder when determining intoxication.* Testimony concerning a defendant's performance on a properly administered HGN test is admissible on the issue of impairment, provided that

the prosecution claims no greater reliability or weight for the HGN evidence than it does for evidence of the defendant's performance on any of the other standard field sobriety tests, and *provided further that the prosecution makes no attempt to correlate the HGN test result with any particular blood-alcohol level, range of blood-alcohol levels, or level of impairment.*

(emphasis added).

*State v. Barker,* 179 W.Va. 194, 366 S.E.2d 642 (1988), is to the same effect. There, the West Virginia Supreme Court concluded that an estimate of blood alcohol content based on an HGN test is inadmissible, stating:

*The HGN test is a field sobriety test.* A police officer's testimony as to a driver's performance on other field sobriety tests like finger-to-nose or walking the line, is admissible at trial as evidence that the driver was under the influence of alcohol. From the evidence presented, we are not convinced that the HGN test should be entitled to any more evidentiary value than other field sobriety tests.

\* \* \*

*Estimates of blood alcohol content based on the HGN test are inadmissible.*

366 S.E.2d at 646 (emphasis added).

*Emerson v. State,* 880 S.W.2d 759 (Tex.Crim.App.1994), is also instructive. In that case, the court took "judicial notice of both the reliability of the theory underlying the HGN test and its technique." *Id.* at 769. Nevertheless, the court was "unable to conclude ... that the HGN technique is a sufficiently reliable indicator of *precise* BAC." *Id.* The court thus determined:

A witness may not use the HGN evidence to quantify the defendant's BAC....[T]he State has other means available for quantifiable proof of a defendant's BAC in a DWI prosecution which are much more effective and reliable, such as the blood test, breathalyzer, and urine test.

*Id.*

Numerous other cases are consistent with the cases discussed above. *See, e.g., Whitson v. State,* 314 Ark. 458, 863

S.W.2d 794, 797–98 (1993) (finding officer's testimony of HGN result "relevant as some proof of intoxication," but implying that HGN test may not be used to quantify BAC); *State v. Garrett*, 119 Idaho 878, 811 P.2d 488, 491 (1991) (recognizing that "HGN test results may not be used at trial to establish the defendant's blood alcohol level in the absence of the chemical analysis of the defendant's blood, breath, or urine"); *People v. Buening*, 229 Ill.App.3d 538, 170 Ill.Dec. 542, 592 N.E.2d 1222, 1227, appeal denied, 146 Ill.2d 634, 176 Ill.Dec. 806, 602 N.E.2d 460 (1992) (concluding that HGN test is not admissible to quantify BAC in the absence of chemical analysis); *State v. Taylor*, 694 A.2d 907, 912 (Me.1997) (concluding that HGN test may not be used by officer to quantify BAC); *City of Fargo v. McLaughlin*, 512 N.W.2d 700, 708 (N.D.1994) (permitting officer to testify about HGN test results as circumstantial evidence of intoxication, but not to quantify BAC); *State v. Bresson*, 51 Ohio St.3d 123, 554 N.E.2d 1330, 1336 (1990) (stating that "although results on an HGN test may be admissible at trial by a properly trained officer, such an officer may not testify as to what he or she believes a driver's actual or specific BAC level would be, based solely on the HGN test results"); *Yell v. State*, 856 P.2d 996, 997 (Okla.Crim.App. 1993) (providing that HGN test results cannot be used to quantify BAC); *State v. O'Key*, 321 Or. 285, 899 P.2d 663, 689–90 (1995) (stating that HGN test is admissible to show defendant was under the influence of alcohol but not to quantify BAC); *State v. Sullivan*, 310 S.C. 311, 426 S.E.2d 766, 769 (1993) (stating that "HGN tests shall not constitute evidence to establish a specific degree of blood alcohol content") (citation omitted). *See also* J. Meaney, Note, *Horizontal Gaze Nystagmus: A Closer Look*, 36 Jurimetrics J. 383, 392 (1996) (stating that all ten state supreme court cases that have decided issues of admissibility concerning HGN test results have concluded that "officer testimony about a suspect's HGN test is admissible to show that the suspect was under the influence of alcohol, but not to provide an estimate of BAC").

The State asserts that, even assuming the court erred, the error was harmless, because the jury acquitted appellant

of driving while intoxicated, and only convicted him of driving under the influence. We disagree.

Again, *Schultz* is instructive. Like appellant, Schultz was convicted of driving under the influence of alcohol. After noting in *Schultz* that many factors may cause nystagmus, we concluded that the erroneous admission of the HGN test results was not harmless. Writing for the Court, Judge Cathell observed:

> No chemical test was administered to appellant in the case *sub judice.* Evidence was proffered by appellant as to injuries that may have affected his ability to perform certain of the other field tests, and there was also evidence that the odor of alcohol smelled by [the officer] may have come from a source other than appellant. Accordingly, we are unable to say that the error was harmless.

*Schultz,* 106 Md.App. at 181, 664 A.2d 60.

Here, no chemical test was administered to appellant. Trooper Redmond testified, however, that he detected a strong odor of alcohol, appellant had trouble with the walk and turn sobriety test, and was, in his opinion, intoxicated. At trial, appellant denied that he had been drinking. Moreover, the passenger corroborated that appellant had not consumed alcohol that evening. Further, appellant testified that he told the trooper that he was taking prescription medicines and that he had injured his leg in an accident, which made it difficult for him to balance. Appellant also explained that he was tired because he had been up since 4:00 a.m. the previous day.

It is also significant to us that, during closing argument, the prosecutor expressly relied on Trooper Redmond's opinion testimony concerning the blood alcohol level, based on the HGN test. She stated that the trooper testified that appellant was "intoxicated and that he believed he had [a blood alcohol content of] at least point one zero or above level of alcohol...."[4] When defense counsel objected, the court over-

---

4. During deliberations, the jury apparently sent a note asking about the "levels" for driving while intoxicated and driving under the influence.

ruled the objection. Then, the prosecutor reiterated to the jury that the trooper gave "his expert opinion that he believed that the defendant was driving while intoxicated and that he had a BAC, a blood alcohol content of at least point one zero. That was his opinion."

Appellant has not specifically attacked the admission of the trooper's testimony based on the trooper's lack of qualifications to ascertain Wilson's BAC from the HGN test. Appellant suggests that no trooper would be qualified to give such testimony on the basis of the HGN test. We observe that even if such opinion testimony were, in the abstract, ordinarily within the purview of the judge's discretion, such testimony was clearly inappropriate here. As we mentioned earlier, the State never propounded any questions to the trooper to establish that he was qualified to ascertain a specific blood alcohol level based on HGN testing.

In sum, if the error in *Schultz* was not harmless, the erroneous admission of Trooper Redmond's expert opinion that he believed appellant probably had a BAC of at least .10 was also not harmless. We cannot ignore "the heightened credence juries tend to give scientific evidence. . . ." *State v. Helms*, 345 N.C. 578, 504 S.E.2d 293, 296 (1998). Indeed, "there is a reasonable possibility that had evidence of the HGN test results not been erroneously admitted a different outcome would have been reached at trial" concerning the DUI charge. *Id.* Because we cannot say the error did not contribute to the jury's conviction as to the DUI charge, we must vacate the DUI conviction.

As we observed, appellant complains that he was improperly sentenced as a subsequent offender with regard to the DUI charge. *See* Md.Code (1977, 1998 Repl.Vol.), § 27–101 of the

---

See R.14. Appellant refers to the note in his brief, but we are unable to locate any discussion, on the record, about the note. We believe that R.14 is the judge's written response to the jury; it contains four sets of initials, presumably indicating approval of the judge's response. The note advised that the jury "must use the definitions [the court] provided . . . in MPJI–Cr. 4:10. . . ."

**560**

Transportation Article; Md. Rule 4–245. Because the precise problem about which he complains might not occur if appellant is convicted at a retrial, we decline to consider appellant's second contention.

JUDGMENT OF CONVICTION FOR UNSAFE LANE CHANGE AFFIRMED; JUDGMENT OF CONVICTION FOR DUI–REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR ST. MARY'S COUNTY FOR FURTHER PROCEEDINGS.

COSTS TO BE DIVIDED EQUALLY BETWEEN APPELLANT AND ST. MARY'S COUNTY.