882 A.2d 934

**Jon Patrick WARREN**

v.

**STATE of Maryland.**

No. 476, Sept. Term, 2004.

Court of Special Appeals of Maryland.

Sept. 8, 2005.

---

Julia Doyle Bernhardt (Nancy S. Forster, Public Defender, on brief), for Appellant.

Gregory D'Alesandro (J. Joseph Curran, Jr., Atty. Gen., on brief), for Appellee.

Panel EYLER, JAMES R., KRAUSER, BARBERA, JJ.

BARBERA, J.

This appeal requires us to interpret Maryland Code (1977, 2002 Repl.Vol.), § 21–801 of the Transportation Article.[1] We focus our attention in particular upon subsection (a) of § 21–801, which provides that "[a] person may not drive a vehicle on a highway at a speed that, with regard to the actual and potential dangers existing, is more than that which is reasonable and prudent under the conditions."

A jury in the Circuit Court for Montgomery County convicted appellant, Jon Patrick Warren, of violating § 21–801(a), and of driving while impaired ("DWI"), in violation of § 21–902(b). The State sought to prove that appellant had violated § 21–801(a) by establishing that he drove 55 miles per hour ("mph") in a 40–mph zone. The State sought to prove that appellant drove while impaired by relying on the lay opinion testimony of three police officers that he was "drunk," "driving under the influence of alcohol," and "highly impaired by alcohol."

Appellant attacks his conviction under § 21–801(a), arguing that excessive speed does not come within the purview of that section, and that the State provided no evidence of the conduct that § 21–801(a) does cover, *i.e.*, failure to drive at a speed that is reasonable and prudent in light of existing conditions that create "actual and potential dangers." Appellant attacks his DWI conviction on the ground that the court should not have permitted the officers' lay opinion testimony.

---

1. Hereinafter, any reference to the Maryland Code will be to this article and version, which was in effect on May 5, 2003, the date of the offense.

Because we agree with appellant that the evidence was legally insufficient to establish a violation of § 21–801(a), we shall reverse that conviction. We shall affirm appellant's DWI conviction, finding no merit in his argument that the officers' opinion testimony was inadmissible.

## FACTS

At approximately 10:30 p.m. on May 5, 2003, Officer John Kennedy, a ten-year veteran of the Montgomery County Police Department, was sitting in his marked patrol vehicle in the parking lot of the "On the Border" restaurant on Rockville Pike. The officer saw a man, later identified as appellant, approximately twenty yards away, walking away from the officer and heading toward a Ford Thunderbird. Officer Kennedy described appellant as "staggering across the parking lot with his shoulders slouched over, swaying, wobbly knees, you know, just very unsteady on his feet[.]" Although he fumbled with the keys, appellant eventually unlocked the driver's side door. He got into the car, sat in the driver's seat for about ten minutes, and repeatedly looked over at Officer Kennedy. Appellant then got out of the car and "staggered, stumbling ... back into the bar[.]"

Officer Kennedy left the area to perform his "regular patrol duties." When he returned to the parking lot about two hours later, he noticed that the Thunderbird was still parked where he had last seen it. Because he thought that appellant had not looked "like he was in any condition ... to drive," and had seemed "very intoxicated," Officer Kennedy set up surveillance about 100 yards away from the car, on the opposite side of the street.

Shortly thereafter, Officer Kennedy saw appellant drive the Thunderbird onto Rockville Pike. Officer Kennedy followed the car and a second officer, Officer Craig Cupiello, followed behind him.

Appellant made "a very wide turn" off of Rockville Pike onto Edmonston Drive, a two-lane road with parking on each side. He drove a little more than one-tenth of a mile "using

the full width of the road[,] ... going from side to side, up the road." Appellant then turned right onto Veirs Mill Road and rapidly accelerated, still drifting between lanes. Officer Kennedy "paced" appellant for approximately two-tenths of a mile, and determined that he was traveling 55 mph in a 40–mph zone. The officer activated his emergency lights, and appellant stopped his car.

Officer Kennedy approached the driver's side door of the car, and "detected a strong odor of an alcoholic beverage." The officer also noticed that appellant's eyes were watery and bloodshot. When the officer asked appellant for his driver's license, appellant removed his wallet from his pocket and fumbled through it, passing over the license several times. Appellant was mumbling and his speech was so "extremely slurred" that the officer could not understand what he was saying.

At that time, Officer Kennedy told appellant to turn off the ignition and exit the car. Appellant did not respond to the officer's request. The officer asked him three more times and, each time, appellant failed to respond. Officer Kennedy testified that he feared for the safety of the citizens present in the area should appellant drive off. He therefore took out his Taser, pointed it at appellant, and told him that if he did not get out of the car, he was going to "get stunned." Appellant still did not respond. The officer then pushed his Taser, set to stun, against appellant's shoulder.[2]

Appellant released his grip on the steering wheel and Officer Kennedy "help[ed] him get out of the car." Because appellant was very wobbly and unsteady on his feet, the officer leaned him against the car. The officer asked appellant to perform field sobriety tests, but appellant refused. Officer Kennedy placed appellant under arrest and transported him to the Rockville District station for processing.

---

2. The officer testified that his Taser delivers 50,000 volts of electricity. In stun mode, the electricity only affects the area of the body the Taser touches. "Tase" mode, on the other hand, affects the entire muscular system.

Appellant collapsed while walking up the steps of the station. Sergeant Tim Falcinelli assisted Officer Kennedy in taking appellant the rest of the way to the processing room. Once they arrived, the officers asked appellant to take a breath test to determine his blood alcohol level, but appellant refused. After sitting at the processing table for about fifteen minutes, appellant "vomited all over the processing [room] floor." Officer Kennedy opined, based on his training and personal experience, that appellant was "highly impaired by alcohol."

Officer Cupiello testified that after Officer Kennedy stopped appellant's vehicle, he, Officer Cupiello, walked to the passenger's side of appellant's car. When appellant finally exited the vehicle, Officer Cupiello saw that appellant had "bloodshot, watery eyes," and "an odor of an alcoholic beverage." The officer observed that appellant seemed confused and incoherent. He opined that appellant was "driving under the influence of alcohol."

Sergeant Falcinelli testified that appellant was "drunk" when he came into the station house. Appellant could not walk, "reeked" of alcohol, slurred his words, had "watery, red, [bloodshot] eyes," and acted confused. He opined that appellant was "under the influence of alcohol."

Appellant testified in his defense. He said that he was on his way home from work when he stopped at a restaurant with two friends. He had one beer at the bar. He was not feeling well, so he went outside to get some fresh air. He was not walking normally because of a foot injury. He testified that he sat in his car "[t]o get away from all the crowd, the noise, the smoke[, and] . . . to clear [his] head a little bit." After about ten minutes, he returned to the bar and attempted to have a second drink, but was not feeling well enough to finish it.

Appellant testified that his driving on the evening in question was not inhibited by alcohol or otherwise inappropriate. According to appellant, when Officer Kennedy stopped and approached his car, the officer immediately asked him to get

out of it. Appellant asked the officer several times whether he wanted to see appellant's license and registration, but the officer simply repeated "a couple of" times his request for appellant to get out of the car. The officer then used his Taser without warning. Appellant explained that his subsequent behavior was the result of the Taser stun.

The jury convicted appellant of driving while impaired and driving in excess of a reasonable and prudent speed, and acquitted him of the charge of driving under the influence of alcohol.[3] The court sentenced appellant to 60 days' imprisonment for driving while impaired, suspending all but 30 days, with 18 months' supervised probation upon release. The court imposed a $75.00 fine for appellant's conviction for driving in excess of a reasonable and prudent speed.

Appellant noted this timely appeal, presenting the following questions for our review:

I. Was the evidence sufficient to sustain appellant's conviction for driving in excess of a reasonable and prudent speed?

II. Did the trial court abuse its discretion in admitting lay opinion testimony that appellant was "drunk," "under the influence of alcohol," and "highly impaired by alcohol"?

## DISCUSSION

### I.

Appellant argues that there was insufficient evidence to sustain his conviction, under § 21–801(a), for driving in excess of a reasonable and prudent speed. He acknowledges that there was evidence that he exceeded the posted speed limit, a violation of § 21–801.1.[4] He insists, however, there was no evidence of any "special danger" on the road, which, he

---

3. The trial court granted appellant's motion for judgment of acquittal on a charge of negligent driving.

4. It is not clear why appellant was not charged with violating § 21–801.1.

maintains, is necessary to sustain his conviction under § 21–801(a). We agree with appellant, and hold that, because the State presented no evidence of "actual and potential dangers" requiring him to reduce his speed to a reasonable and prudent level, the conviction under § 21–801(a) must be reversed.

Section 21–801, entitled "Basic rule," provides:

(a) *Reasonableness and prudence required.*—A person may not drive a vehicle on a highway at a speed that, with regard to the actual and potential dangers existing, is more than that which is reasonable and prudent under the conditions.

(b) *Driver to control speed.*—At all times, the driver of a vehicle on a highway shall control the speed of the vehicle as necessary to avoid colliding with any person or any vehicle or other conveyance that, in compliance with legal requirements and the duty of all persons to use due care, is on or entering the highway.

(c) *Drivers to reduce speed in certain circumstances.*—Consistent with the requirements of this section, the driver of a vehicle shall drive at an appropriate, reduced speed when approaching and crossing an intersection at which cross traffic is not required to stop by a traffic control device.

(d) *Approaching and crossing railroad grade crossings.*—Consistent with the requirements of this section, the driver of a vehicle shall drive at an appropriate, reduced speed when approaching and crossing a railroad grade crossing.

(e) *Approaching and going around curves.*—Consistent with the requirements of this section, the driver of a vehicle shall drive at an appropriate, reduced speed when approaching and going around a curve.

(f) *Approaching crests of grades.*—Consistent with the requirements of this section, the driver of a vehicle shall drive at an appropriate, reduced speed when approaching the crest of a grade.

(g) *Traveling on narrow or winding roadways.*—Consistent with the requirements of this section, the driver of a vehicle shall drive at an appropriate, reduced speed when traveling on any narrow or winding roadway.

(h) *Special dangers as to pedestrians or other traffic.*— Consistent with the requirements of this section, the driver of a vehicle shall drive at an appropriate, reduced speed when any special danger exists as to pedestrians or other traffic or because of weather or highway conditions.

The primary rule of statutory interpretation is to ascertain and effectuate legislative intent. *See, e.g., Pete v. State,* 384 Md. 47, 57, 862 A.2d 419 (2004). We begin the analysis by examining the plain language of the statute, "for the legislative intent of a statute primarily reveals itself through the statute's very, words." *Price v. State,* 378 Md. 378, 387, 835 A.2d 1221 (2003) (citations omitted). We are cautioned not to add or delete language in a way that indicates an intent not reflected by the plain and unambiguous language of the statute. *Pete,* 384 Md. at 57, 862 A.2d 419. "[N]or may [we] construe the statute with forced or subtle interpretations that limit or extend its application." *Id.* "Statutes on the same subject are to be read together and harmonized to the extent possible[.]" *Id.* at 65, 862 A.2d 419 (citations and quotation marks omitted). "If the words of a statute are clear and unambiguous, our inquiry ordinarily ends and we need investigate no further, but simply apply the statute as it reads." *Gillespie v. State,* 370 Md. 219, 222, 804 A.2d 426 (2002).

Section 21–801 is located in subtitle 8 of the Transportation Article and is entitled "Speed Restrictions." Subsection (a) of § 21–801 prohibits driving at a speed that is "*more* than that which is reasonable and prudent" under the prevailing circumstances. (Emphasis added.) What is "reasonable and prudent" is dictated by existing "conditions." Subsections (c) through (h) set forth specific conditions requiring a reduced speed: when there is special danger to pedestrians or other traffic, poor weather conditions, and when approaching any of the following: an intersection at which traffic is not controlled

by a traffic control device; a railroad crossing; a curve; a crest of a hill; or when traveling on a narrow or winding road.

Subsections (a) and (b) are more general. Nonetheless, both of those subsections apply only when certain driving conditions prevail. Subsection (a) refers to "actual and potential dangers" and prohibits driving under those "conditions" at a speed that is unreasonable or imprudent. Subsection (b) requires the driver to control the vehicle's speed when a collision with a person or vehicle might occur. Read in its entirety, § 21–801 plainly requires drivers to reduce speed, from what otherwise would be a lawful maximum speed, to that which is reasonable or prudent in light of existing conditions that present an "actual or potential danger."

This construction of § 21–801 makes sense in light of, and is in harmony with, § 21–801.1. The latter section prohibits speed over a specified maximum speed limit. The specified speed is governed by highway type (divided or undivided) and location (business, residential, or "other locations").[5] Section

---

5. Section 21–801.1, entitled "Maximum limits," provides:

(a) *General rule.*—Unless there is a special danger that requires a lower speed to comply with § 21–801 of this subtitle, the limits specified in this section or otherwise established under this subtitle are maximum lawful speeds. A person may not drive a vehicle on a highway at a speed that exceeds these limits.

(b) *Specific limits.*—Except as otherwise provided in this section, the maximum speed limits are:

(1) 30 miles an hour on:

(i) All highways in a business district; and

(ii) Undivided highways in a residential district;

(2) 35 miles an hour on divided highways in a residential district;

(3) 50 miles an hour on undivided highways in other locations; and

(4) 55 miles an hour on divided highways in other locations.

(c) *Continuation of certain prior limits.*—Except as provided in subsection (e) of this section, a posted maximum speed limit lawfully in effect on December 31, 1974, is a maximum lawful speed even if it differs from a limit specified in subsection (b) of this section.

(d) *Alteration of limits.*—Except as provided in subsection (e) of this section, a maximum speed limit specified in subsection (b) of this section or in effect under subsection (c) of this section may be altered as provided in this subtitle.

21-801.1(a) includes the caveat that the statutory maximum designated speed pertains, "[u]nless there is a special danger that requires a lower speed to comply with § 21-801[.]"

The State argues that this quoted language from § 21-801.1(a) applies to subsections (c)-(h) of § 21-801, but not to subsections (a) and (b). We disagree. Nothing in § 21-801.1(a) suggests such a limited reading of it. Moreover, the narrow interpretation advanced by the State does not make common sense. And, if indeed the Maryland General Assembly intended the language in § 21-801.1(a) to apply only to § 21-801(c)-(h), it certainly knew how to make that clear.

■ The State argues that excessive speed (in this case, driving 55 mph in a 40-mph zone) can create the "actual or potential danger" under § 21-801(a). Though excessive speed certainly may be an actual or potential danger, we disagree that excessive speed is a "condition" of the sort envisioned by the Legislature when it enacted § 21-801. As we have said, § 21-801 addresses circumstances under which speed must be reduced. Further, the plain language of the section suggests

---

(e) *Limits may not exceed 55 or 65 miles an hour.*—(1) Notwithstanding any other provision of this subtitle, a maximum speed limit of more than 55 miles an hour may not be established or continued on any highway in this State that:

(i) Is not an interstate highway or an expressway; or

(ii) Would subject the State to federal funding sanctions under 23 United States Code § 154.

(2) Subject to the provisions of paragraph (1) of, this subsection, a maximum speed limit of more than 65 miles an hour may not be established on any highway in the State.

(f) *St. Mary's County.*—(1) Unless otherwise posted on a public road in a residential subdivision, in residential subdivisions in St. Mary's County, a posted speed limit on a main access road applies to all public roads in the residential subdivision, even if the posted speed limit on the main access road is less than 30 miles per hour.

(2) The provisions of paragraph (1) of this subsection do not apply when a through road traverses a residential subdivision. The maximum speed limit applicable to the subdivision shall be posted on each road exiting off the through road and into the subdivision, along with the posting on the main access road.

(3) A maximum speed limit established under this subsection in a residential subdivision shall be based on the subdivision's road design, motor vehicle traffic, and pedestrian safety.

that the conditions requiring a reduced speed under § 21–801 are not those created by driving behavior, but rather are those external conditions to which a driver must react.

■ The State also argues that evidence of appellant's erratic driving (making a wide right turn and weaving in and out of lanes), created an actual or potential danger sufficient to sustain his conviction under § 21–801(a). Again, the State is only half right. Driving erratically, like speeding, can create an actual or potential danger. But § 21–801(a), like subsections (b) through (h), addresses speed, not driving behaviors unrelated to speed.

■ Finally, we are not persuaded by the State's argument that the darkness that attends nightfall is a condition contemplated by § 21–801(a). In outlining specific conditions that may require a person to drive at less than the posted speed limit in subsections (c) through (h), the General Assembly anticipated specific conditions that may require a slower rate of speed. Certain of these conditions may occur with great frequency; others, with less frequency. None of these conditions, however, is as certain to occur as nightfall. Considering that the Legislature envisioned and included in § 21–801 less common potential dangers on Maryland roadways, we conclude that the omission of darkness was deliberate.

Moreover, if the State were correct that darkness, without more, requires reduced speed on the roadways, then every driver who drives *at the speed limit* at nighttime would be in violation of § 21–801(a). We do not believe the General Assembly intended such a result. *See State v. Glass,* 386 Md. 401, 410, 872 A.2d 729 (2005) (stating that reviewing courts should avoid constructions that lead to results that do not comport with common sense); *Price,* 378 Md. at 387, 835 A.2d 1221 (stating that reviewing courts should not "construe the statute with forced or subtle interpretations that ... extend its application").

■ In sum, we hold that § 21–801(a) requires drivers to reduce speed to a reasonable and prudent level to account for

existing conditions—external to driving behavior itself—that create "actual and potential dangers." Because the State failed to show that appellant's speed was unreasonable and imprudent in light of a condition that created an "actual and potential" danger, there was insufficient evidence to support his conviction for violating § 21–801(a). Accordingly, we reverse that conviction.

## II.

Appellant argues that the trial court abused its discretion in permitting the three police officers to testify that he was "drunk," "under the influence of alcohol," and "highly impaired by alcohol." He maintains that this improperly admitted lay opinion testimony requires reversal of his DWI conviction. We disagree.

■ The decision to admit lay opinion testimony is vested within the sound discretion of the trial judge. *Bey v. State,* 140 Md.App. 607, 623, 781 A.2d 952 (2001), *cert. denied,* 368 Md. 526, 796 A.2d 695 (2002). The officers were not admitted as experts; therefore, Maryland Rule 5–701, addressing the admissibility of opinion testimony by lay witnesses, applies.

Rule 5–701 provides:

If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

*See also Ragland v. State,* 385 Md. 706, 717, 870 A.2d 609 (2005) (stating that "[l]ay opinion testimony is testimony that is rationally based on the perception of the witness"); *Bruce v. State,* 328 Md. 594, 630, 616 A.2d 392 (1992) (stating that "lay opinions which are derived from first-hand knowledge, are rationally based, and are helpful to the trier of fact are admissible"), *cert. denied,* 508 U.S. 963, 113 S.Ct. 2936, 124 L.Ed.2d 686 (1993); *Rosenberg v. State,* 129 Md.App. 221, 255, 741 A.2d 533 (1999) (same), *cert. denied,* 358 Md. 382, 749 A.2d

173 (2000); Lynn Mclain, Maryland Evidence § 701:1a (2001) (same). "It has been suggested as the overriding principle that 'opinions of laymen should be rejected only when they are superfluous in the sense that they will be of no value to the jury.' " *Bruce*, 328 Md. at 630, 616 A.2d 392 (citation omitted).

In *Ragland*, the Court of Appeals set forth "a helpful explanation of lay opinion testimony":

> "The prototypical example of the type of evidence contemplated by the adoption of [Federal Rule of Evidence] 701 relates to the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences.... Other examples of this type of quintessential Rule 701 testimony include identification of an individual, the speed of a vehicle, the mental state or responsibility of another, whether another was healthy, [and] the value of one's property."

*Ragland*, 385 Md. at 718, 870 A.2d 609 quoting *Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1196–98 (3rd Cir.1995) (alteration in original).

The *Ragland* Court made clear, however, that expert opinion testimony may not be offered in the guise of lay opinion testimony. "[Maryland] Rules 5–701 and 5–702 prohibit the admission as 'lay opinion' of testimony based upon specialized knowledge, skill, experience, training or education." [6] 385 Md. at 725, 870 A.2d 609.

Perceiving whether someone is intoxicated does not require specialized knowledge, because "the condition of intoxication and its common accompaniments are ... a matter of general knowledge." *State v. Magaha*, 182 Md. 122, 130, 32 A.2d 477 (1943). *Accord Crampton v. State*, 71 Md.App. 375, 388, 525 A.2d 1087 (1987), *aff'd on other grounds*, 314 Md. 265, 550

---

6. Appellant does not argue that the officers' opinions in this case were expert opinions improperly admitted as lay opinions. Consequently, we do not address whether the officers relied, at all or in part, on their special expertise and training in rendering their opinions.

A.2d 693 (1988); *see also Cumberland & Westernport Transit Co. v. Metz*, 158 Md. 424, 450, 149 A. 565 (noting that "intoxication is a fact which any one may observe"), *appeal dismissed sub nom*, 282 U.S. 801, 51 S.Ct. 40, 75 L.Ed. 720 (1930); *Md. & Pa. R.R. Co. v. Tucker*, 115 Md. 43, 51, 80 A. 688 (1911) (quoting with approval *State v. Pike*, 49 N.H. 399 (1870), and stating: " 'Intoxication is a fact open to the observation of any one, and requiring no skill or learning to discern it' "); JOSEPH F. MURPHY, JR., MARYLAND EVIDENCE HANDBOOK § 603(C) (3d ed.1999) (explaining that a lay witness may opine, *inter alia*, that someone was under the influence of alcohol because "these are the kind of observations we make on a daily basis"); MCLAIN, *supra*, 701:le. at 707–08 (stating that "[a] lay witness with first-hand knowledge may testify," *inter alia*, that someone was "drunk or sober").

■ The rule of admissibility of lay opinion testimony is no different when, as in this case, the lay opinion is offered by a police officer. *See, e.g., State v. Rich*, 132 N.C.App. 440, 512 S.E.2d 441, 448 (1999) (holding that "the trial court was correct in allowing [a non-expert police officer] to offer his opinion" that the defendant was "appreciably impaired and unable to operate a vehicle"), *aff'd*, 351 N.C. 386, 527 S.E.2d 299, 306 (2000); *New v. State*, 254 Ind. 307, 259 N.E.2d 696, 699 (1970) (holding that the trial court properly admitted testimony offered by a non-expert police officer that the defendant was intoxicated); *Mozley v. State*, 163 Tex.Crim. 250, 290 S.W.2d 518, 520 (1956) (holding that the trial court did not err in permitting the officer who arrested the defendant to testify that the defendant was drunk, because "[a] non-expert witness may express his opinion as to intoxication when such opinion is based upon his observation of the appearance, acts and conduct of an accused").

■ We hold that the trial court did not abuse its discretion in permitting the police officers to express their lay opinion that appellant was. "drunk," "under the influence of alcohol," and "highly impaired by alcohol." Each officer's testimony was rationally based on his perception of appellant's condition.

And each officer's testimony included not only his opinion concerning appellant's alcohol impairment, but also a description of his actual observations of appellant. *See* 31A Am.Jur. 2D *Expert and Opinion Evidence* § 198 (2005) (noting that it is "preferable" that a person offering a lay opinion preface that opinion with testimony about the individual's "actions and conduct"). The officers' opinion testimony, moreover, was relevant to the issues in this case, helpful to the jury, and not unfairly prejudicial.

*Wilson v. State*, 124 Md.App. 543, 723 A.2d 494 (1999), upon which appellant relies, does not compel a different conclusion. In *Wilson*, the State trooper who stopped the defendant testified as an expert witness in administering and evaluating the results of a horizontal gaze nystagmus ("HGN") test. *Id.* at 545–46, 723 A.2d 494. Over objection, the trooper was permitted to opine that, based on the results of the HGN test, the defendant was driving while intoxicated and that his blood alcohol content ("BAC") was probably 0.10 or higher. *Id.* at 549, 723 A.2d 494. We held that the trooper should not have been permitted to offer testimony on the defendant's BAC. *Id.* at 553, 723 A.2d 494. We explained:

> In our view, the court erred in permitting Trooper Redmond to testify that, based on the HGN test results, he believed appellant's blood alcohol content was "probably point one zero or higher." Although the trooper was qualified to administer the HGN test and, to that extent, was properly received as an expert, *HGN testing may not be used to establish a specific blood alcohol level.* Indeed, as the lengthy colloquy that we quoted earlier makes plain, the State never sought to establish that the trooper's expertise in administering the HGN test included the ability to determine specific blood alcohol content based on the HGN test results. The HGN test is a type of field sobriety test, but it is not the equivalent of laboratory chemical analysis of blood, breath, or urine.

*Id.* (emphasis added).

*Wilson* is inapposite to the present case. The officers in this case did not offer an opinion—lay or expert—concerning

appellant's BAC. Appellant nonetheless argues that, by testifying that he was "drunk," "under the influence," and "highly impaired by alcohol," the police officers were attempting to quantify his BAC. We disagree with this argument, finding no support in the record for it.

In sum, we are persuaded that the court did not abuse its discretion in permitting the State to elicit the police officers' lay opinion testimony that appellant was "highly impaired by alcohol," "under the influence of alcohol," and "drunk."

**JUDGMENT OF CONVICTION FOR DRIVING IN EXCESS OF A REASONABLE AND PRUDENT SPEED REVERSED; JUDGMENT OF CONVICTION FOR DRIVING WHILE IMPAIRED BY ALCOHOL AFFIRMED.**

**COSTS TO BE DIVIDED EQUALLY BETWEEN APPELLANT AND MONTGOMERY COUNTY.**