366 S.E.2d 642

**STATE of West Virginia**

v.

**Robert M. BARKER.**

No. 17942.

Supreme Court of Appeals of West Virginia.

Feb. 23, 1988.

Richard M. Richmond, Asst. Pros. Atty., Parkersburg, for state.

Ernest M. Douglass, Parkersburg, for Robert Barker.

BROTHERTON, Justice:

Robert M. Barker appeals his conviction by a Wood County jury of Third Offense Driving Under the Influence of Alcohol, W.Va.Code § 17C–5–2(i) (Supp.1987). Barker argues that the lower court erred in admitting (1) evidence of his prior convictions for driving under the influence; (2) the results of a Horizontal Gaze Nystagmus Test; and (3) evidence that Barker refused to take a breathalyzer test.[1] For the reasons set forth below, we find the results of the Horizontal Gaze Nystagmus test should have been excluded, and we reverse the judgment of the Circuit Court of Wood County and remand for further proceedings.

On April 12, 1986, Officer Michael E. Davis of the Parkersburg, West Virginia Police Department responded to a report of two disorderly drunks in a dark Ford Pinto. Immediately after Officer Davis began following the Pinto, the appellant, who was driving, pulled off to the side of the road. Officer Davis pulled in behind him and turned on his flashing blue lights. Barker exited the vehicle and began to walk away. Officer Davis caught up with Barker and accompanied him back to his police cruiser. Officer Davis observed that Barker was swaying from side to side as he walked and that he smelled of alcohol. After Barker failed a series of three field sobriety tests, the finger-to-nose test, the recitation-of-the-alphabet test, and the Horizontal Gaze Nystagmus test, Officer Davis arrested Barker for driving under the influence of alcohol.[2]

When they arrived at the police station, Officer Davis asked Barker to take a breathalyzer test and informed him of the

---

1. Other errors raised by the appellant are without merit, and we do not address them.

2. Meanwhile, Parkersburg City Police Officer Jeffrey Dyke had arrived at the scene. Officer Dyke approached Barker's vehicle and observed a passenger, who was allowed to leave the scene on foot. Officer Dyke also observed an open can of beer on the floorboard of the passenger side of the vehicle and an open can of beer underneath the driver's seat.

statutory penalty for refusing to do so.[3] Barker refused to take the breath test unless his lawyer was present. Officer Davis explained that the breath sample must be taken within two hours of his arrest. Because approximately one and one-half hours had already passed since his arrest, it would be impossible for his attorney to be present before the two-hour period had expired. Barker still refused the breath test and was then arraigned before the magistrate and incarcerated.

On April 22, 1986, the magistrate court issued a warrant charging Barker with Third Offense Driving Under the Influence, citing two prior DUI convictions. On June 14, 1986, the Grand Jury of Wood County issued an indictment charging Barker with Third Offense Driving Under the Influence of Alcohol in violation of W.Va.Code § 17C–5–2(i) (Supp.1987). On October 30, 1986, a Wood County jury found Barker guilty of Third Offense Driving Under the Influence of Alcohol. Barker was sentenced to a prison term of not less than one or more than three years.

## I.

Barker argues that the lower court erred in permitting Officer Davis to testify as to the results of the Horizontal Gaze Nystagmus (HGN) test. The HGN test is based on the principle that consumption of alcohol causes nystagmus. Nystagmus is the rhythmic oscillation of the eyes in a horizontal, vertical or rotary direction. *The Merck Manual of Diagnosis and Therapy* 1980 (14th ed. 1982).[4] Nystagmus can be congenital or can be caused by a variety of conditions affecting the brain, including ingestion of drugs such as alcohol or barbiturates. *Id.* The HGN test allows a police officer to estimate the level of alcohol in the blood by observing the occurrence of nystagmus in a person suspected of driving under the influence of alcohol.

To administer the HGN test, a police officer asks the driver to cover one eye and focus the other on an object, usually a pen, held by the officer at the driver's eye level. *See, e.g., State v. Superior Court,* 149 Ariz. 269, 718 P.2d 171, 173 (1986) (describing administration of HGN test). "As the officer moves the object gradually out of the driver's field of vision toward his ear, he watches the driver's eyeball to detect involuntary jerking" or nystagmus. *Id.* The officer then repeats the test with the other eye. Onset of nystagmus at an angle of 40° or less in relation to the center point yields a blood alcohol estimate of .10% or greater. *See id.* at 174 n. 1; 1 R. Erwin, *Defense of Drunk Driving Cases* § 8.15A[1] (3d ed. 1987).

Over defense counsel's objection, the trial court qualified Officer Davis as an expert in the area of the HGN test. Officer Davis' training in the administration of the HGN test consisted of a one-day, eight-hour training session conducted by the West Virginia State Police in 1984. Officer Davis testified that he had administered the HGN test approximately one hundred times and that comparisons of his estimates of blood alcohol levels based on the HGN test with levels shown on a breathalyzer had revealed only minimal variance. Testifying as an expert, Officer Davis told the jury that based on the results of the HGN test he estimated Barker's blood alcohol level at .20%.

In general, "[i]n order for a scientific test to be initially admissible, there must be general acceptance of the scientific principle which underlies the test." Syl. pt. 7, *State v. Clawson,* 165 W.Va. 588, 270 S.E.2d 659 (1980).[5] There are some scien-

---

**3.** Officer Davis advised Barker that pursuant to W.Va.Code § 17C–5–4 (1986) operation of a motor vehicle in this State implies consent to a secondary chemical test of blood, breath, or urine for the purpose of determining the alcoholic content of the blood, and that refusal to submit to a breath or urine test results in the revocation of the driver's license.

**4.** Jerk nystagmus, one of the several types of nystagmus, is characterized by a slow drift, usually away from the gaze, followed by a quick jerk or recovery in the direction of the gaze. *The Merck Manual of Diagnosis and Therapy* 1980 (14th ed. 1982).

**5.** This general rule is based on the *"Frye* test" which is derived from the following statement

tific tests, such as ballistics tests, fingerprint identification, and blood tests, which are so generally accepted in the scientific community that a trial court may take judicial notice of their reliability. 165 W.Va. 618, 270 S.E.2d at 676. However, "where the reliability of the scientific test cannot be judicially noticed, its reliability must be demonstrated before the expert can testify concerning the test." 165 W.Va. 618, 270 S.E.2d at 677.

■ In the present case, the State offered no evidence to demonstrate the reliability of either the HGN test or the scientific principle upon which the HGN test is based, *i.e.*, that alcohol consumption causes nystagmus. The only testimony regarding the HGN test came from Officer Davis. Officer Davis told the jury that the HGN test "consists of the measurement of the horizontal movement of the eye as it is affected by alcohol," and described how he performed the test.[6] He also described the reaction of a sober person's eye to the test, and how that reaction is affected by consumption of alcohol. He did not, however, address the scientific reliability of the test. We, therefore, find that the lower court erred in admitting Officer Davis' testimony concerning the HGN test.[7]

One of the dangers inherent in expert testimony in regard to scientific tests is that the jury may not understand the exact nature of the test and the particular methodology of the test procedure, and may accord an undue significance to the expert testimony. *State v. Clawson*, 165 W.Va.

---

in *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923):

> [W]hile the courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

See *State v. Clawson*, 165 W.Va. 588, 270 S.E.2d 659, 676 (1980).

6. Officer Davis testified concerning the HGN test, in relevant part, as follows:

> Q. Now, how did you perform that test at the time?
> A. Just have them look straight forward at a fixed object. I use the tip of my inkpen and have them follow the movement.
> Q. What do you do while they are observing this?
> A. I observe the horizontal movement of their eyes while they are doing this.
> Q. And what does this show?
> A. The test shows the effect of the alcohol on their ability to follow—
> Q. I am sorry. Go ahead. I didn't mean to—
> A. The side-to-side movement of the person's eyes is affected by the consumption of alcohol. And at a point in the movement, the eye will begin to jerk from side to side.
> Q. Well, you anticipated the question. What do you expect in a normal person's eye, when they follow this end point, and I am speaking of a normal person who has not consumed any alcohol?
> A. A normal person is able to follow the movement of the object with the fluid movement of the eye without any jerking motion.
> Q. Now, what happens with the consumption of more and more alcohol?
> A. As a person consumes alcohol, the eye will begin to shake from side to side. The degree of onset at which it begins to shake can be used to determine the blood alcohol content of the person.
> Q. Now, what did you observe in Mr. Barker on this evening or early morning?
> A. The side-to-side movement of the eye began almost instantaneously upon the movement of the pen.
> Q. And did it continue, or did it subside during the—
> A. Yes, sir, the movement continued. Also the ability to follow the moving object was very poor.

> \* \* \* \* \* \*

> Q. You say that on that State's Exhibit 1 somewhere you transcribed your results of the gaze test that you took. Where is that?
> A. Yes, sir, it is in the section marked for "REMARKS." It has, "Failed HGN test," which is the horizontal gaze nystagmus test, with an estimate of .20.

R. at 27.

Officer Davis administered the HGN test as a two-part test. Before administering the eye portion described above, Officer Davis had Barker perform a balance test. The test required Barker to stand on one leg with his arms at his side and count aloud to thirty. Officer Davis testified that Barker was unable to maintain his balance.

7. *Cf. Commonwealth v. Miller*, 367 Pa.Super. 359, 532 A.2d 1186, 1189–90 (1987) (officer's testimony was inadequate foundation for admission of testimony regarding results of HGN test); *State v. Reed*, 83 Or.App. 451, 732 P.2d 66, 69 (1987) (although arresting officer was qualified to give HGN test, she was not qualified as expert on relationship, if any, between alcohol consumption and nystagmus).

588, 270 S.E.2d 659, 678 (1980).[8] It therefore seems reasonable to require, as we did in *Clawson*, some *in camera* disclosure of the methodology, scientific reliability, and results of the HGN test, as well as evidence of whether accepted test procedures were followed by qualified personnel in a particular case. *See* 165 W.Va. at 619–620, 270 S.E.2d at 677–78. A demonstration of reliability should include both testimony by expert witnesses and relevant articles and scholarly publications. *See* 165 W.Va. at 618, 270 S.E.2d at 677.[9] Because the State did not introduce evidence of the scientific reliability of the test in this case, we do not reach the question of whether the HGN test is sufficiently reliable to be admissible.

■ Even if the HGN test were found to be reliable, and its results admissible, we would be left with the question of whether estimates of blood alcohol content based on a driver's performance of the HGN test are admissible. The HGN test is a field sobriety test. A police officer's testimony as to a driver's performance on other field sobriety tests like finger-to-nose or walking the line, is admissible at trial as evidence that the driver was under the influence of alcohol. From the evidence presented, we are not convinced that the HGN test should be entitled to any more evidentiary value than other field sobriety tests. We note that unlike the blood, breath, and urine tests, the HGN test has not been recognized by our state legislature as a method for measuring blood alcohol content. *See* W.Va.

Code § 17C–5–4 (1986). We, therefore, find that even if the reliability of the HGN test is demonstrated, an expert's testimony as to a driver's performance on the test is admissible only as evidence that the driver was under the influence. Estimates of blood alcohol content based on the HGN test are inadmissible.[10]

## II.

■ Barker also argues that the lower court erred in admitting evidence of his prior convictions for driving under the influence of alcohol. The record before us shows that on August 6, 1982, Barker pleaded guilty to driving under the influence and was fined and sentenced to a twenty-four-hour jail term. On August 22, 1983, Barker again pleaded guilty to first offense DUI as the result of a plea bargain reducing the offense charged from second offense DUI to first offense DUI. Barker was fined and sentenced to a jail term of three months.

Barker maintains that his pleas to the two prior offenses were not made voluntarily and intelligently because, even though he had counsel present, it was not made clear to him in 1983 that as a consequence of his plea to first offense DUI, his next DUI offense would constitute third offense DUI. In short, Barker argues that he cannot be convicted of third offense DUI because he has not been convicted of second offense DUI.

---

**8.** In this regard, one commentator has noted that expert testimony concerning the HGN test is subject to abuse:

> Since so little is known by attorneys and police officers about what nystagmus is, what causes it, and what it means, the field is wide open for unqualified or incompetent experts to take the witness stand and testify about nystagmus and what its relationship to the consumption of alcohol is.

1 Erwin, *Defense of Drunk Driving Cases* § 8.15A[3] (3d ed. 1987).

**9.** *Cf. State v. Superior Court,* 149 Ariz. 269, 718 P.2d 171, 173, 180 (1986). In *State v. Superior Court,* the defendant moved to exclude testimony of the HGN test at trial. At the evidentiary hearing on the motion the State presented evidence regarding the principles and use of HGN testing from (1) a research psychologist who

had studied the effect of alcohol on behavior; (2) an officer of the Los Angeles Police Department, who was at that time a supervisor in charge of DUI enforcement for the City of Los Angeles and a consultant to the National Highway Traffic Safety Administration (NHTSA) on field sobriety testing, and (3) two officers of the Arizona Department of Public Safety, one of whom at that time administered the HGN training program for the State of Arizona. In addition to the testimony of these witnesses, the State submitted scientific publications and research reports done for the NHTSA.

**10.** *But cf. State v. Superior Court,* 149 Ariz. 269, 718 P.2d 171, 181 (1986) (HGN test may not be used to establish accused's level of blood alcohol in absence of chemical analysis of blood, breath or urine showing proscribed blood alcohol content).

We do not have the record of the August 23, 1983, proceeding before us. Therefore, it is impossible for us to ascertain whether Barker was informed that his plea of guilty to first offense DUI would be considered his *second* DUI offense should he be charged with DUI a third time. Certainly Barker knew, however, that multiple DUI offenses would result in increased degrees of punishment. His 1983 DUI charge was for second offense DUI; only through plea bargaining was it shown on his record as a plea to first offense DUI. Nevertheless, there is no requirement that a defendant be advised of the penalty enhancement consequences of a subsequent conviction. A conviction for third offense DUI requires only two prior DUI convictions. *See* W.Va. Code § 17C–5–2(i) (Supp.1987).[11] A prior conviction of *second* offense DUI is not a prerequisite for conviction of third offense DUI. That both of Barker's prior convictions were for first offense DUI is, therefore, irrelevant. Consequently, we conclude that the lower court did not err in admitting evidence of Barker's prior DUI convictions.[12]

For the foregoing reasons, the judgment of the Circuit Court of Wood County is reversed, and this case is remanded for further proceedings consistent with this opinion.[13]

Reversed and remanded.

---

**11.** West Virginia Code § 17C–5–2(i) (Supp.1987) provides:

> A person *violating* any provision of subsection (b), (c), (d), (e), (f) or (g) of this section shall, for the third or any subsequent offense under this section, be guilty of a felony, and, upon conviction thereof, shall be imprisoned in the penitentiary for not less than one nor more than three years, and the court may, in its discretion, impose a fine of not less than three thousand dollars nor more than five thousand dollars.

(emphasis added).

**12.** *Cf. State v. Cozart*, 177 W.Va. 400, 352 S.E.2d 152, 154 n. 1 (1986) (prior conviction is admissi-

ble where it is necessary element of current offense charged or is utilized to enhance penalty).

**13.** Barker also argues that the lower court erred in admitting evidence that Barker refused to take a breathalyzer test. Because we reverse on the issue of the HGN test, we do not address the merits of this argument. On remand, the lower court should apply the principles set forth in *State v. Cozart*, 177 W.Va. 400, 352 S.E.2d 152, 157 (1986) governing the admissibility of evidence of refusal to take the breathalyzer test.