421 S.E.2d 41

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Timothy E. CONRAD, Defendant Below, Appellant.**

No. 20524.

Supreme Court of Appeals of West Virginia.

Submitted May 5, 1992.

Decided July 14, 1992.

David L. Hill, Hill, McCoy & Corey, Hurricane, for appellant.

Mario J. Palumbo, Michael J. Basile, Office of Atty. Gen., Charleston, for appellee.

PER CURIAM:

The defendant, Timothy Conrad, was convicted of "second offense DUI" (driving while under the influence of alcohol) by jury verdict in the Circuit Court of Putnam County. Upon appeal, the defendant submits that the trial court committed reversible error when it (1) denied the defendant's motion to disallow the use of certain breathalyzer test results at trial, and (2) permitted the use of the defendant's first DUI conviction (dated September 23, 1983) to enhance the defendant's sentence in this case. Upon a careful review of the record and the applicable law, we find that the trial court did not err and we therefore affirm the jury verdict.

On August 14, 1983, the defendant was arrested for first offense DUI. After proceeding to trial in the Putnam County Magistrate Court, the defendant was convicted of first offense DUI pursuant to *W.Va. Code*, 17C–5–2 [1983].[1]

On February 2, 1989, the defendant was driving an AMC Eagle in Teays Valley, Putnam County, between 1:30 a.m. and 2:00 a.m. His vehicle was observed by Deputy Sheriffs Roger Blankenship and Charles Sisk of the Putnam County Sheriff's Department. The deputies observed the defendant's vehicle exit Interstate 64 onto Route 34 heading south. When the defendant's vehicle exited the interstate, it pulled out in front of another vehicle. The deputies observed the defendant's car moving at a slow rate of speed and weaving on the road. The deputies, who were parked in a service station while observing the defendant's vehicle, pulled out behind the defendant as he passed, and followed the defendant's vehicle a short distance. When the defendant failed to use his turn signal when he made a left turn, the deputies turned on the blue lights of their patrol car and pulled in behind the defendant's vehicle.

Upon approaching the driver's side of the defendant's vehicle, Deputy Blankenship recognized the driver as the defendant.[2] There was also a passenger in the defendant's vehicle, Mr. Mancil Linkous. Deputy Blankenship testified that a strong odor of alcohol emanated from the defendant's vehicle, and that the defendant's coordination appeared "messed up" and his speech slurred. After requesting the defendant's driver's license and vehicle registration card, Deputy Blankenship asked the defendant to step out of the vehicle and take a "field sobriety test"[3] to determine whether

---

1. *W.Va.Code*, 17C–5–2 [1983] provided, *inter alia,* that any person who drives a vehicle in this state while under the influence of alcohol, controlled substance, or drug shall be guilty of a misdemeanor.

2. Deputy Blankenship acknowledged that the defendant was married to his niece.

3. Deputy Blankenship testified as to the "field sobriety test" he gave to the defendant:

the defendant was intoxicated. The defendant failed the "field sobriety test," and was thereafter arrested for DUI by the deputies. The deputies also arrested Mr. Linkous for public intoxication.

The deputies then transported the defendant and Mr. Linkous to jail. The defendant was read an "implied consent law" form by Deputy Sisk at the jail, advising the defendant of his right to take a breathalyzer test. The defendant agreed to take the breathalyzer test.

Deputy Sisk testified that he was certified by the West Virginia Department of Health to operate the "Intoxilyzer 5000," the machine by which the breathalyzer test was given. Deputy Sisk completed a nine-stage preparation and operation scheme to ready the "Intoxilyzer 5000" for use by the defendant. He marked an "operational check list" as he completed each of the nine stages.[4] Deputy Sisk testified that he followed the "operational check list" and, after noting that the breathalyzer machine was "warmed up," he provided the defendant a sterile mouthpiece for which to blow into the machine. When the breathalyzer machine read "please blow," he asked the defendant to blow into the machine.

Deputy Sisk testified that it took the defendant two or three tries to register on the machine because, "he was not actually

blowing." The machine then printed out a ticket with the results of the test. The ticket gave a blood/alcohol level reading of 0.16 per cent. The ticket incorrectly noted a date of January 23, 1988 and a time of "03:41." The ticket further noted that the "subject test," for which the 0.16 per cent blood/alcohol level reading was given, was a "deficient sample—value printed was highest obtained." Deputy Sisk added in long-hand form at the bottom of the ticket: "Intoxilyzer time is off 1 Hr. 23 minutes. Date is also off."

Deputy Sisk then testified that the fact that the Intoxilyzer 5000 gave incorrect time and date readings on the ticket did not have any relationship to the blood/alcohol instrument readings. Furthermore, Deputy Sisk testified that he had completed a "calibration check" which confirmed that the blood/alcohol level reading instruments were in proper working order. Deputy Sisk made an analogy between the time and date readings on a home video player and those on the Intoxilyzer 5000. He testified:

> Well, if the power would go out or if there is a power surge then the clock without a battery backup, which this does not have, would stop working. It's kind of like your VCR at home. If you come in and there has been a storm or

---

The test I give was, I asked him to walk an imaginary straight line just to check his balance. I asked him to stop and turn around and stand there for a second and then come back to me. I explained that to him before I had him take the test. And he—when he walked the straight line, he was walking—staggering. When he stopped and turned around he was swaying back and forth and then I asked him to come back to me and he was staggering also back to me. When he got up to me I asked him to place his feet together and touch them toe to toe and extend his arms from his side and tilt his head back and close his eyes. I had him to stand in that position for a short time and when I did, he was going back and forwards like this (indicating). I thought he was going to fall. Then I asked him to take any finger from his left hand and touch his nose and any finger from his right hand and touch his nose—I use my left-hand because I am left-handed—and he couldn't touch his nose. So he completely failed what is called the field sobriety test. His eyes were bloodshot, his speech was badly

slurred. He appeared extremely intoxicated to me.

**4.** The nine stages of the "operational check list" completed by Deputy Sisk were:

1. Observe subject for twenty (20) minutes prior to collection of breath specimen during which peroid [sic] the subject must NOT have injested [sic] alcoholic berverages [sic] or other fluids.
2. Instrument on—Display reads "push button to start".
3. Plug in simulator containing known alcohol solution and allow to warm up to 34 [degrees] c = .2 [degrees] c.
4. Insert sterile mouthpiece in breath tube.
5. Push "start test" button.
6. Insert printer ticket as directed by display.
7. When instrument displays "Please Blow" have subject blow into mouthpiece until tone stops.
8. When display reads "Test Complete", remove printer ticket.
9. Give subject top copy of printer ticket.

your power has went off, your VCR the clock on it may be blinking. Okay, without a battery backup in this, your clock can't work, but your VCR still has the function in it to play a VCR tape. You can still record movies on it, but the time just won't show on it. It's the same with this Breathalyzer."

Deputy Sisk explained that no member of his department has access to the internal workings of the Intoxilyzer 5000, so they could not change the incorrect date and time readings on the machine. He did not know what had caused the incorrect time and date readings on the breathalyzer machine at the time of the defendant's test.

The defendant objected to presentation of the breathalyzer test results to the jury on the basis that the ticket printed by the Intoxilyzer 5000 contained the notation "deficient sample—value printed highest obtained" in reference to the test results. Deputy Sisk testified that a "deficient sample" reading by the machine did not mean that the sample was inaccurate, only that the canister was not filled with the defendant's breath when a reading was given by the machine. He testified that the reading was accurate for the sample blown by the defendant, and that the blood/alcohol level reading would have been higher had the defendant filled the canister with his breath.

The defendant presented the testimony of Jeffrey Russell, a bystander to the arrest. He testified that he observed the arrest of the defendant from his vehicle parked nearby. He alleged that the deputies interfered with the defendant's ability to take the "field sobriety test," and that one of the deputies hit the defendant in the chest, and that both deputies were shoving and pushing the defendant as he attempted to perform the test. Mr. Russell admitted that he had earlier told an investigating police officer that the defendant appeared intoxicated at the time of the arrest. At the trial, however, he asserted that he did not know whether or not the defendant had been "drunk" at the time of the arrest.

The defendant testified that he had consumed only two beers during the evening prior to his arrest. He testified that he had been driving slowly and that his vehicle had been "jerking" due to mechanical problems.[5] The defendant asserted that he successfully completed the first part of the "field sobriety test," but that the deputies did not permit him to attempt the latter part of the test and immediately arrested him. He further asserted that the Intoxilyzer 5000 was not in proper working order and that the mouthpiece was not sterile.[6]

The jury returned a verdict of guilty, and by order of the trial court entered October 1, 1990, the defendant was sentenced to confinement in the Putnam County jail for a period of six months and one day. This appeal followed.

I

On appeal, the defendant first contends that the trial court erred in allowing the use of the breathalyzer test results over the defendant's objection. In the syllabus of *State v. Hood*, 155 W.Va. 337, 184 S.E.2d 334 (1971), we held that a proper foundation must be laid to admit evidence of breathalyzer test results:

> Before the result of a Breathalyzer test for blood alcohol administered pursuant to Code, 17C–5A–1 et seq., as amended, is admissible into evidence in a trial for the offense of operating a motor vehicle while under the influence of intoxicating liquor, a proper foundation must be laid for the admission of such evidence.

We thereafter elaborated on elements of a "proper foundation" for the admissibility of breathalyzer test results:

> It further appears that the necessary foundation before the admission of the

---

**5.** The defendant asserted that: "The shackle on the back end of [the car] was pulled back and was revving and wanting to pull to the right.

**6.** The State thereafter presented the rebuttal testimony of Deputy Sisk, who reasserted that a

sterile mouthpiece was used, and that the breathalyzer machine was operating properly because he had completed a "calibration check" which confirmed that blood/alcohol level reading was accurate.

results of any test are: (1) That the testing device or equipment was in proper working order; (2) that the person giving and interpreting the test was properly qualified; (3) that the test was properly conducted; and (4) that there was compliance with any statutory requirements.

*State v. Hood,* 155 W.Va. at 342, 184 S.E.2d at 335.

The defendant argues that because the printout on which the breathalyzer test result was indicated displayed an inaccurate time and date, and was marked "deficient sample—value printed was highest obtained," then, therefore, the machine was not in "proper working order" as required by the *Hood* foundation analysis. For the reasons that follow, we disagree.

■ In syllabus point 3 of *State v. Dyer,* 160 W.Va. 166, 233 S.E.2d 309 (1977), we held that evidence of the result of a breathalyzer test, when administered in compliance with the law, is admissible as *prima facie* evidence that the person tested was under the influence of intoxicating liquor:

> Upon the trial of a person arrested for the offense of driving a motor vehicle on a public highway or street of the state while under the influence of intoxicating liquor, evidence of the results of a breathalyzer test, administered in compliance with the requirements of law, showing that there was at the time ten hundredths of one percent or more, by weight, of alcohol in such person's blood, is admissible as prima facie evidence that the person was under the influence of intoxicating liquor. W.Va.Code, 17C–5A–5.

And in syllabus point 4 of *Dyer,* we held that, to be admissible, a breathalyzer test must be performed in accord with the methods and standards approved by the state department of health:

> In the trial of a person charged with driving a motor vehicle on the public streets or highways of the state while under the influence of intoxicating li-

quor, a chemical analysis of the accused person's blood, breath or urine, in order to be admissible in evidence in compliance with provisions of W.Va.Code, 17C–5A–5, 'must be performed in accordance with methods and standards approved by the state department of health.' When the results of a breathalyzer test, not shown by the record to have been so performed or administered, are received in the trial evidence on which the accused is convicted, the admission of such evidence is prejudicial error and the conviction will be reversed.

■ In the instant case, the record shows that Deputy Sisk, who performed the breathalyzer test on the defendant, had been certified by the West Virginia Department of Health to operate the machine and had over four years of operational experience. Deputy Sisk documented his performance of the methods and standards approved by the state department of health on a nine-step operational checklist. Furthermore, Deputy Sisk explained that the inaccuracies concerning time and date on the printout were wholly unrelated to the accuracy of the blood/alcohol level reading. Deputy Sisk rectified the time and date inaccuracies by noting the actual time, in handwriting, on the printout itself, as well as the fact that the date was inaccurate.

Deputy Sisk further explained that the "deficient sample" notation next to the test result of the defendant's blood/alcohol level meant only that the defendant had failed to fill the canister with his breath.[7] In fact, the reading on the printout was an *accurate* reading of the air produced by the defendant, and had the defendant actually filled the canister, the blood/alcohol level reading would have been higher than the 0.16 value printed on the ticket.

Based upon the foregoing, then, we find that there was sufficient evidence that the machine was in proper working order, and therefore the trial court did not err in admitting the results of the breathalyzer test.

---

**7.** Deputy Sisk testified that the defendant was not actually blowing, and that the machine was

designed so that a child could produce enough breath to fill the canister.

## II

As his second assignment of error, the defendant asserts that the trial court should have disallowed any use of the defendant's September 23, 1983 DUI conviction for enhancement purposes under *W. Va. Code*, 17C–5–2(h). We find no merit in this contention. *W. Va. Code*, 17C–5–2(h) [1983] states:

> (h) A person violating any provision of subsection (b), (c), (d),[8] (e), (f) or (g) of this section shall, for the second offense under this section, be guilty of a misdemeanor, and, upon conviction thereof, shall be imprisoned in the county jail for a period of not less than six months nor more than one year, and the court may, in its discretion, impose a fine of not less than one thousand dollars nor more than three thousand dollars.

*W. Va. Code*, 17C–5–2(h) became effective on June 10, 1983, two months before the defendant's arrest for DUI, first offense. Prior to June 10, 1983, a DUI conviction could only be used to enhance a penalty for a subsequent conviction for five years from the date of the initial conviction, *inter alia*, *W. Va. Code*, 17C–5–2 [1981]. The defendant's argument is based upon the premise that, at the time of the 1983 conviction, he "was informed ... by his lawyer or the magistrate that the conviction would only be held against him for five years from the date of the conviction."

■ There is absolutely nothing in the record to support the defendant's assertion. Moreover, *W. Va. Code*, 17C–5–2 [1983], was effective *prior* to both DUI offenses committed by the defendant and removed the five-year DUI conviction use rule from the statute. In *State v. Barker*, 179 W.Va. 194, 199, 366 S.E.2d 642, 647 (1988), we addressed a similar contention and held that: "[t]here is no requirement that a defendant be advised of the [potential] penalty enhancement consequences of a subsequent conviction."[9] Consequently, we conclude that the lower court did not err in admitting evidence of the defendant's initial DUI conviction.

Based upon the foregoing reasons, the judgment of the Circuit Court of Putnam County is affirmed.

Affirmed.

---

8. *W. Va. Code*, 17C–5–2(d) [1983] was the statute violated by the defendant on August 14, 1983. It states:

> (d) Any person who:
> (1) Drives a vehicle in this state while:
> (A) He is under the influence of alcohol, or
> (B) He is under the influence of any controlled substance, or
> (C) He is under the influence of any other drug, or
> (D) He is under the combined influence of alcohol and any controlled substance or any other drug, or
> (E) He has an alcohol concentration in his blood of ten hundredths of one percent or more, by weight; and

> (2) Shall be guilty of a misdemeanor, and, upon conviction thereof, shall be imprisoned in the county jail for not less than one day nor more than six months, which jail term shall include actual confinement of not less than twenty-four hours, and shall be fined not less than one hundred dollars nor more than five hundred dollars.

9. In *Barker* the defendant argued that he was never told that his plea of guilty to *first offense* DUI, when he had been charged with second offense DUI, could be used, along with a prior first offense DUI conviction, to comprise the elements of third offense DUI and enhance a later sentence. We held that there was no requirement that a defendant be so advised.