******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

HARPER, J., dissenting in part and concurring in part. I write separately to express my opinion that the trial court did not improperly restrict the cross-examination by the defendant, Juan C. Lopez, of the state's expert witness, Robert H. Powers, a forensic toxicology expert, and my conclusion that the defendant's conviction should be affirmed. The conclusion reached by the majority requires us to make assumptions that are not supported by the record and to ignore established precedent concerning the analysis of whether a jury has complied with the trial court's instructions. I do, however, concur in the conclusion of the majority that the trial court did not abuse its discretion in admitting an "incomplete and altered" dashboard camera video taken from the arresting police officer's patrol car. I would affirm the judgment of the trial court on all claims.

The following facts, which the jury reasonably could have found, and procedural history are relevant to this appeal. On March 3, 2013, at approximately 1:50 a.m., the defendant was stopped on Interstate 95 in Fairfield by state police Trooper Colin Richter after Richter observed the defendant driving erratically and speeding. Richter performed a series of standard field sobriety tests on the defendant, which the defendant failed. Thereafter, Richter arrested the defendant, and charged him with operating a motor vehicle while under the influence of alcohol in violation of General Statutes § 14-227a (a) (1) and driving with a suspended license in violation of General Statutes § 14-215. No tests were performed to determine the defendant's blood alcohol content level via a chemical analysis of his blood, urine, or breath.

At trial, the state pursued a drunken driving prosecution under § 14-227a (a) (1) on the basis of behavioral evidence of intoxication, known as a behavioral prosecution or behavioral theory. Because the state pursued a behavioral prosecution, it was prohibited by § 14-227a (c) from presenting evidence of the defendant's blood alcohol level that derived from a chemical analysis of his blood, urine, or breath. The state presented two witnesses: Richter, who testified regarding the circumstances of his encounter with the defendant and the factors that led him to arrest the defendant; and Powers, who testified regarding the scientific basis of the field sobriety tests and the intoxication status of a person who fails such tests. The trial court qualified Richter as an expert in the administration of field sobriety tests on the basis of his training and experience, and Powers as an expert in toxicology, including the scientific basis of field sobriety tests.

Richter testified regarding his interactions with the

defendant from his first observation of the defendant driving erratically through his arrest and booking at the state police barracks. The following testimony from Richter is relevant. He testified that his interaction with the defendant began when he noticed a vehicle approaching him quickly from behind on Interstate 95 in Fairfield and then speeding past him. Richter then followed the vehicle and observed the vehicle being driven erratically, swerving between the left and center lanes. Richter thereafter activated the overhead lights in his police cruiser and stopped the vehicle. The vehicle safely maneuvered from the left lane across the center and right lanes before coming to a stop on the right shoulder of the highway. Richter approached the vehicle and found that the defendant was the driver of the vehicle. Richter then proceeded to ask the defendant standard questions about where he was going, where he was coming from, and whether he could provide a driver's license for Richter to inspect.[1] During this interaction, Richter noted that the defendant had slurred speech, his eyes were glassy and bloodshot, and he had the odor of alcohol on his breath. On the basis of these details, Richter suspected that the defendant was intoxicated and determined that it would be appropriate for him to perform a series of field sobriety tests on the defendant.

Richter instructed the defendant to exit his vehicle in order to undergo the field sobriety tests. These tests included the horizontal gaze nystagmus test, the walk and turn test, and the one leg stand test. Before performing each test, Richter gave the defendant detailed instructions and demonstrations, asked if the defendant understood the instructions, and asked if the defendant had any medical conditions or physical impairments that would impact the results. Each time, the defendant stated that he understood the instructions and did not have any medical or physical conditions that would affect his performance on the tests.

The first test Richter performed on the defendant was the horizontal gaze nystagmus test. Richter testified that the test looks for nystagmus, which is an involuntary jerking of the eyes that is indicative of intoxication. The test required the defendant to track Richter's pen[2] with his eyes only while Richter held his pen a few inches in front of the defendant's eyes and moved his pen from side to side. When officers perform this test, they look for lack of smooth pursuit of the eyes, onset of nystagmus prior to 45 degree turn of the eyes, and nystagmus at the maximum deviation of the eye turned from center. Richter testified that the presence of these symptoms indicates intoxication. The defendant failed the test because Richter observed all three factors indicative of intoxication in the defendant's performance on the test.

The second test Richter performed on the defendant

was the walk and turn test. Richter testified that this test consists of having the defendant walk heel to toe in a straight line for exactly nine steps, with his arms at his side, turn in a particular direction, and then walk back to the starting point. The defendant failed this test because he started the test before instructed to do so, could not stay on the line he was instructed to walk, raised his arms in order to gain better balance, turned incorrectly, failed to walk heel to toe, took an incorrect number of steps, and swayed.

The third and final test that Richter performed on the defendant was the one leg stand test. Richter testified that this test consists of the defendant counting out loud as he stands on one foot while raising the other foot approximately six inches off the ground and counting, keeping his arms at his sides. The defendant failed this test because he put his foot down three times, he swayed, and he was unable to properly count.

Richter testified that he determined that the defendant was intoxicated and could not safely operate a motor vehicle because the defendant failed the field sobriety tests, and because Richter had observed other indicators of intoxication, including glassy and bloodshot eyes, the odor of alcohol on his breath, and erratic driving. Additionally, Richter testified that the defendant admitted drinking mojitos earlier that evening, although the location of where the defendant stated he drank this alcohol was not consistent with where the defendant initially told Richter he was coming from when Richter stopped him on the highway.

Subsequently, Richter placed the defendant under arrest and transported him to the state police barracks to be processed. Richter testified that, at the barracks, the defendant still smelled of alcohol and had bloodshot and glassy eyes, and acted intoxicated throughout the booking process by exhibiting belligerent behavior. Also during the booking process, the defendant refused to submit to a breath test to determine his blood alcohol level.

Following Richter's testimony, the state called Powers to testify. As previously noted, Powers was qualified by the court as an expert in forensic toxicology. Powers testified that the field sobriety tests performed by Richter on the defendant are reliable indicators of whether a person is likely intoxicated or impaired because they seek to identify involuntary symptoms that are commonly caused by intoxication.

The state then asked Powers to opine on a series of hypotheticals that involved a hypothetical person exhibiting the same behaviors and performance on the field sobriety tests as Richter testified the defendant had exhibited. Powers testified that, on the basis of the behaviors described, he would expect that person to be under the influence of a central nervous system

depressant, such as alcohol. He further explained that he would expect such a person to have a blood alcohol level of 0.12 or higher because below that level people do not generally completely fail the field sobriety tests. Further, he would expect such a person to have a diminished ability to operate a motor vehicle.

The defendant objected to the state's questions regarding the blood alcohol level of the hypothetical person. First, the defendant objected on the ground that there was inadequate foundation regarding "how much alcohol" for the state to ask: "And if these same symptoms, based upon the [hypothetical] . . . and based on the assumptions that we've talked about here in court, were caused by alcohol, could you opine as to how much alcohol it would take to achieve those symptoms?" The court overruled the objection because the question asked only whether Powers could form an opinion on the information provided to him on the basis of his education, training, and experience. Powers answered that he could form an opinion, and the state then asked Powers to give his opinion. The defendant objected again on the ground that there was inadequate foundation regarding "how much alcohol." The court overruled the objection because there was proper foundation for Powers to offer his opinion as a forensic toxicologist because he had been qualified as an expert witness in the field of forensic toxicology.

On cross-examination of Powers, the defendant asked numerous questions regarding the state's hypotheticals, and Powers' underlying scientific knowledge regarding field sobriety tests and how such tests relate to a person's ability to operate a motor vehicle under certain blood alcohol levels. The defendant also twice attempted to ask Powers to opine on the ultimate issue of the case—specifically, whether the defendant was intoxicated. On his first attempt, the defendant made a rambling statement that could be viewed as either asking about the defendant's blood alcohol level or about whether the defendant was so intoxicated as to be legally impaired: "Without—with any degree of medical certainty with you not being present at this scene on [Interstate] 95 on March 3, 2013, at 1:52 a.m., you—you do not know what [the defendant's] level of intoxication was." The court sustained the state's objection to this question, and the defendant attempted to ask the question again by rephrasing it: "As you sit here today, do you know if [the defendant] was intoxicated that day?" The court again sustained the state's objection to this question.

Following the testimony of Richter and Powers, the state rested, and the defendant called no witnesses. The jury found the defendant guilty of operating a motor vehicle while under the influence of alcohol in violation of § 14-227a (a) (1) and of driving with a suspended license in violation of § 14-215. The defendant also

pleaded guilty to a part B information as a third time offender. The court sentenced the defendant to three years of incarceration, execution suspended after two years, followed by three years of probation. This appeal followed.

I disagree with the majority's conclusion that the defendant's right to cross-examine Powers was improperly restricted and that the restriction was harmful to a degree requiring reversal of the defendant's conviction. The defendant argues, and the majority agrees, that once Powers opined on direct examination that a hypothetical individual who performed in a certain way on each of the field sobriety tests would be expected to have a blood alcohol level of 0.12 or higher, the court should not have foreclosed the defendant from later cross-examining him about this central, relevant issue. A thorough review of the trial transcripts shows that the court did not prevent, improperly or otherwise, the defendant from cross-examining Powers regarding his testimony as to the blood alcohol level of a person described in the hypotheticals posed by the prosecutor. Rather, the questions that he was prohibited from asking sought Powers' opinion on the ultimate issue of the case—whether the defendant was intoxicated—and it is only on appeal that the defendant casts these questions as an attempt to undermine Powers' testimony regarding blood alcohol content.

"[R]estrictions on the scope of cross-examination are within the sound discretion of the trial judge . . . but this discretion comes into play only after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment [to the United States constitution]." (Internal quotation marks omitted.) *State* v. *Daniel B.*, 164 Conn. App. 318, 341, 137 A.3d 837, cert. granted on other grounds, 323 Conn. 910, 149 A.3d 495 (2016). This sixth amendment right is satisfied "when defense counsel is permitted to expose to the jury the facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." (Internal quotation marks omitted.) Id. "The defendant's sixth amendment right . . . does not require the trial court to forgo completely restraints on the admissibility of evidence. . . . Generally, [a defendant] must comply with established rules of procedure and evidence . . . ." (Internal quotation marks omitted.) *State* v. *Wright*, 273 Conn. 418, 424, 870 A.2d 1039 (2005). It is well established that "[a]n expert witness ordinarily may not express an opinion on an ultimate issue of fact, which must be decided by the trier of fact." (Internal quotation marks omitted.) *State* v. *Taylor G.*, 315 Conn. 734, 761, 110 A.3d 338 (2015).

The defendant's claim that his cross-examination of Powers was improperly restricted concerns two questions only, and each time the defendant asked these

questions, the court properly sustained the state's objections because the questions improperly sought Powers' opinion on the ultimate issue of intoxication. On his first attempt, the defendant asked: "Without— with any degree of medical certainty with you not being present at this scene on [Interstate] 95 on March 3rd, 2013, at 1:52 a.m., you—you do not know what [the defendant's] level of intoxication was" (first question). Immediately after the court properly sustained an objection to this question, the defendant rephrased the question as: "As you sit here today, do you know if [the defendant] was intoxicated that day?" (second question). Taken together, these questions make clear that the defendant was attempting to ask about an ultimate issue and that the court properly prohibited him from doing so. Under the case law cited herein, this is a proper restraint on cross-examination and does not provide a basis for this court to reverse the defendant's conviction. It is only on appeal that the defendant has attempted to cast these questions in a different light by suggesting that the questions were an attempt to undermine Powers' blood alcohol content testimony and clarify that Powers was not testifying as to the defendant's blood alcohol level.

There are three primary reasons why the prohibition on these two questions did not improperly restrict the defendant's right to cross-examine Powers. First, in the context of the cross-examination as a whole, there is no basis to support a claim that the defendant's right to cross-examine was improperly restricted on the basis of the court's sustaining objections to only two questions. When the cross-examination is viewed as a whole, it is clear that the defendant was afforded an opportunity to thoroughly cross-examine Powers regarding his blood alcohol content testimony.

As previously noted, to satisfy the defendant's right to cross-examine the state's witnesses under the sixth amendment, he must be "permitted to expose to the jury the facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." (Internal quotation marks omitted.) *State* v. *Daniel B.*, supra, 164 Conn. App. 341. The defendant was afforded an ample opportunity to do so. On cross-examination, the following colloquy took place:

"[Defense Counsel]: Now, so you had testified that regarding the horizontal gaze nystagmus, how many types of nystagmus are there?

"[Powers]: Well, I think medical personnel parse it down quite a bit. In terms of forensic work, we really only pay attention to horizontal and vertical.

"[Defense Counsel]: Okay. But as an expert in forensic toxicology and the effects of depressants on the central nervous system, you should know the different

types of nystagmus. Is that correct?

"[Powers]: I should?

"[Defense Counsel]: But you don't know all of the types of nystagmus?

"[Powers]: No, I don't know all the medical classifications of nystagmus.

"[Defense Counsel]: Okay. And so are you familiar with optokinetic nystagmus?

"[Powers]: I'm sorry?

"[Defense Counsel]: Are you familiar with optokinetic nystagmus?

"[Powers]: Optokinetic nystagmus. I may have read the term, but I couldn't define it for you.

"[Defense Counsel]: Okay. But you've done research on . . . the effects of depressants on the central nervous system and the horizontal gaze nystagmus, yet you don't know what optokinetic nystagmus is?

"[Powers]: Correct.

"[Defense Counsel]: Okay. And so you don't know that there possibly might be another forty-seven types of nystagmus?

"[Powers]: Again, I would indicate that the medical community parses this down quite a little bit. For my purposes, I focused on horizontal and vertical gaze nystagmus.

"[Defense Counsel]: So—and that is only based upon interpretations from police officers on the road for the . . . horizontal gaze nystagmus?

"[Powers]: The observations that we utilize are generally acquired by that fashion, yes.

"[Defense Counsel]: Okay. And have you ever consulted . . . with any neurologists or doctors that are specialized in neurology that could affect the nystagmus of the eye? Have you ever consulted with anybody like that in any of your studies?

"[Powers]: I had a question that has led me to do so.

"[Defense Counsel]: Okay. But you don't think that it's necessary to know about the different types of nystagmus if you're going to be an expert in nystagmus?

"[Powers]: I guess that would depend on the level of expertise with regard to nystagmus that one is claiming.

"[Defense Counsel]: So, you don't think that you have the certain level of expertise, then, if you've never studied it?

"[Powers]: I'm not offering . . . an understanding of nystagmus that one would expect from a medical person who has trained in that field.

\*\*\*

"[Defense Counsel]: . . . If a person has driven from Stamford, Connecticut, to Fairfield, Connecticut, was not involved in any accidents, was pulled over by a trooper, the trooper only saw the car swerve once, the operator then pulled over three lanes from the left lane to the middle lane to the right lane to the shoulder, parked the car properly, did not hit any other objects, did not hit a guardrail; and would those set of facts change your opinion as to the level of intoxication somebody may have?

"[Powers]: Probably not; but I recognize that that level of control and behavior seems inconsistent with the level of alcohol that I opined earlier, assuming this is all referring to the same individual.

"[Defense Counsel]: Okay. So, it is—so, assume that it's the same individual and—but you just testified that . . . it doesn't indicate the person that you just opined to. So, would that . . . level of intoxication be lower, then, if they had that much control over a vehicle?

"[Powers]: I'm just saying . . . that the behavior you described seems inconsistent to me with the behavior described in the performance of the standardized field sobriety tests. And I heard it as weaving. But nevertheless I was responding to your question. . . .

"[Defense Counsel]: And were you on [Interstate] 95 on March 3rd, 2013, at 1:52 am?

"[Powers]: I can say no.

"[Defense Counsel]: And so you were not present when any field sobriety tests were administered to [the defendant]?

"[Powers]: Correct. I was not."

The majority attempts to belittle this examination by referring to it in footnote 10 of its opinion as "quantity" over "quality." While *quantity* over *quality* certainly is not determinative, nor do I assert that it is, this line of questioning, with accompanying responses, clearly demonstrates that the defendant was permitted to thoroughly cross-examine Powers and used that cross-examination to undermine Powers' credibility on his interpretation of field sobriety tests and the accuracy of his blood alcohol content testimony regarding the hypothetical person. On this basis alone, this court should affirm the defendant's conviction.

Second, when the defendant's cross-examination of Powers is considered in its entirety, it is clear that the two questions he was prevented from asking are of a different nature than the other questions he asked, and these two questions should be considered as being outside the proper scope of cross-examination. Indeed, as support for the assertion that the ambiguous phrase, "level of intoxication," in the first question should be understood as a reference to a blood alcohol level,

the majority references questions the defendant asked Powers earlier in cross-examination, in which it is clear that the defendant was using this phrase to refer to Powers' testimony regarding blood alcohol content. The previously cited cross-examination shows that the defendant was permitted to ask Powers questions regarding the blood alcohol level of the hypothetical person that the state's questions had posited. This was properly within the scope of cross-examination because the state had asked Powers to opine as to the blood alcohol level of that hypothetical person. Accordingly, the defendant was permitted to thoroughly examine Powers regarding the hypotheticals.

The state did not, however, ask Powers to speculate as to the defendant's blood alcohol level. Rather, the state merely asked Powers to opine as to the blood alcohol level of a person exhibiting the behaviors described in the posed hypotheticals. In fact, no evidence of the defendant's blood alcohol level was offered at trial.[3] Indeed, it would have been impossible to offer such evidence because the defendant refused to submit to a breath test on the night of his arrest.[4]

By contrast, the two questions highlighted by the defendant were outside the proper scope of cross-examination because they asked Powers to opine on whether the defendant was intoxicated. In the first question, the defendant called on Powers to refute the statement, "you do not know what [the defendant's] level of intoxication was." Similarly, in the second question, the defendant asked Powers, "do you know if [the defendant] was intoxicated that day?" Independent of the trial court's proper conclusion that these questions inappropriately called on Powers to opine on an ultimate issue, I also conclude that these questions could have been properly barred as outside the scope of direct examination.

Third, the light in which the defendant attempts to cast these questions on appeal is contrary to his objections to their exclusion during trial. On appeal, he argues that these questions did not seek an opinion on an ultimate issue, but rather that these questions were an attempt to clarify Powers' earlier testimony opining as to a blood alcohol level in order to help the jury understand that Powers was not testifying as to his opinion of the defendant's blood alcohol level.[5] There is no connection between this asserted purpose of the questions and the questions themselves, both of which asked Powers whether he knew if the defendant was intoxicated. It is a matter of common sense that a question seeking to clarify an issue must make clear on which issue clarification is sought. Neither of the two questions at issue here made reference to Powers' earlier testimony regarding the blood alcohol level of the hypothetical person. Neither question asked Powers to distinguish between the hypothetical person and the

defendant. Rather, the defendant simply asked Powers if he knew whether the defendant was intoxicated. Thus, the prohibition on these two questions was proper, as they clearly were outside the scope of cross-examination.

Although, as noted previously, I do not agree that the defendant's right to cross-examine Powers was improperly restricted, I continue my analysis in order to address the majority's conclusion that this restriction on cross-examination caused the defendant harm requiring reversal. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [A] nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict. . . . [O]ur determination [of whether] the defendant was harmed by the trial court's . . . [evidentiary ruling] is guided by the various factors that we have articulated as relevant [to] the inquiry of evidentiary harmlessness . . . such as the importance of the . . . testimony in the [state's] case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony . . . on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the [state's] case. . . . *Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Rodriguez*, 311 Conn. 80, 89, 83 A.3d 595 (2014). Even assuming *arguendo* that there was an improper restriction on the cross-examination of Powers, after applying these factors to the present case, I cannot agree with the majority that the record supports the conclusion that Powers' blood alcohol content testimony, and therefore the restriction on the defendant's questions on cross-examination, had *any* impact on the trier of fact and the result of the trial.

As an initial matter, in the context of the evidence presented as a whole, the result of the trial would have been the same, even if the defendant had been permitted to ask the two questions on cross-examination. The jury heard Richter's testimony as to his observations of the defendant's driving—that the defendant's car was swerving and speeding. The jury heard Richter's observations that the defendant had slurred speech, his eyes were glassy and bloodshot, and he had the odor of alcohol on his breath. The jury heard Richter's testimony that the defendant had admitted to drinking alcohol earlier in the evening. The jury heard Richter's lengthy testimony that the defendant failed all three field sobriety tests. The jury also heard testimony that the defendant refused to submit to a breath test. On the basis of this evidence alone, even without Powers' testimony, the jury reasonably could have found the defendant guilty of operating a motor vehicle while

under the influence of alcohol in violation of § 14-227a (a) (1). The defendant has not met his burden of showing how a restriction on just two questions was harmful. See id. Thus, in light of the " 'the overall strength of the [state's] case,' "; id.; even if the restriction on the defendant's two questions was improper, the error was harmless.

Further, the majority's conclusion to the contrary relies on assumptions that are unsupported by the record and requires the court to ignore established precedent regarding analysis of whether a jury has complied with the trial court's instructions. The majority's conclusion that the restriction on cross-examination was harmful relies on the assumption that the jury viewed Powers' testimony regarding the blood alcohol level of the hypothetical person as conclusive of the defendant's blood alcohol level. But this assumption itself relies on several additional assumptions that are equally unsupported by the record.

First, the majority's conclusion necessarily assumes that Powers' blood alcohol content testimony regarding a hypothetical person influenced the jury's determination of whether the defendant was intoxicated. This assumption rests on the additional assumptions that the jury was either unable to distinguish between the hypothetical person and the defendant, or somehow viewed an opinion regarding a hypothetical person's expected blood alcohol level as conclusively determinative of the defendant's intoxication status.[6] It is unnecessary to address these assumptions further than to note that there is simply nothing in the record to support them.

Second, the majority is clear that it presumes that the jury was aware that Connecticut law specifies a particular blood alcohol level as constituting per se intoxication. In footnote 12 of its opinion, the majority states that it "is likely within the common knowledge of most jurors" that a "specific blood alcohol level . . . constitutes per se intoxication in this state for purposes of operating a motor vehicle under the influence . . . ." The record contains no evidence, testimony, arguments from counsel, or instructions from the court regarding the fact that Connecticut law identifies some blood alcohol level as per se intoxication or explaining what specific level constitutes per se intoxication. While I certainly agree with the majority that many people are aware that the law designates some blood alcohol level as constituting per se intoxication, I do not agree that the average lay person could recite, without reference to a statute or conducting cursory independent research, which specific blood alcohol level constitutes per se intoxication. The record contains no indication that the jury was provided with the information necessary to conclude that the defendant was per se intoxicated based on a 0.12 or higher blood alcohol level.

When the blood alcohol content testimony is divorced from the information that such a blood alcohol level would constitute per se intoxication, it becomes merely another factor for the jury's consideration—on par with testimony that the defendant's speech was slurred, that his driving was erratic, that there was an odor of alcohol on his breath, that his eyes were bloodshot and glassy, and that he failed all three field sobriety tests. In this context, Powers' blood alcohol content testimony told the jury nothing more than that the hypothetical person would be expected to have alcohol in his blood and at a level that Powers associates with impaired ability to drive a motor vehicle. This is markedly different from the majority's assumption that this testimony informed the jury that the defendant was necessarily intoxicated as a matter of law due to a particular blood alcohol level, which had not even been attributed to the defendant.

Third, implicit in the majority's conclusion is the assumption that the jury ignored or deliberately disobeyed the court's instructions on finding intoxication. The court's instructions to the jury made no reference to finding the defendant guilty on the basis of any blood alcohol level, but instead made reference to behavioral evidence only.[7] Yet, the majority's conclusion necessarily assumes that the jury considered Powers' blood alcohol content testimony as determinative of the defendant's intoxication status. As stated numerous times herein, however, no evidence of the defendant's blood alcohol level was introduced at trial. Therefore, the jury instructions properly made reference to behavioral evidence only,[8] and there is nothing in the record to support a finding that the jury disregarded the court's instructions.

"[I]n the absence of evidence that the jury disregarded any of the court's instructions, we presume that the jury followed the instructions." *State* v. *A. M.*, 324 Conn. 190, 215, 152 A.3d 49 (2016). "Mere conjecture by the defendant is insufficient to rebut this presumption." *State* v. *Purcell*, 174 Conn. App. 401, 413, 166 A.3d 883 (2017). The defendant has the burden of establishing that Powers' testimony was so prejudicial that the jury cannot be presumed reasonably to have followed the court's instructions. See id. The defendant has pointed to no evidence that the jury failed to determine intoxication according to the instructions of the trial court. He also has failed to establish that Powers' testimony was so prejudicial as to lead the jury to disregard the court's instructions—particularly given that his claims of prejudice rely so heavily on the assumptions noted previously, which lack evidentiary support in the record. There is simply no reason to conclude that the defendant's conviction was based on any consideration other than the proper behavioral evidence referenced by the court in its instructions on finding intoxication.

For the foregoing reasons, I would affirm the judg-

ment of the trial court.

[1] The defendant was unable to produce a driver's license, which Richter later determined had been suspended, and a computer check of the defendant's motor vehicle registration performed from the computer in Richter's police cruiser revealed that the defendant's registration for the vehicle he was operating had expired.

[2] Richter testified that he administers the test using either his finger or his pen. In this case, Richter recalled using his finger to determine equal tracking of the defendant's eyes prior to administering the test. Richter then used a pen to administer the horizontal gaze nystagmus test.

[3] This fact did not receive adequate attention from the majority. There can be no dispute that no evidence of the defendant's blood alcohol level was offered at any point during the trial. The majority nevertheless, in effect, treats Powers' opinion as to the blood alcohol level of an individual described in the state's hypothetical as being testimony about the defendant's blood alcohol level.

[4] The jury was well aware that there was no evidence of the defendant's blood alcohol level in this matter—further negating any argument that the jury considered such evidence in finding the defendant guilty, as I will discuss in greater detail—because Richter, in response to the prosecutor's questioning, testified as follows:

"[The Prosecutor]: Now, on March 3rd, 2013, did you ask the defendant to submit to a breath test?

"[Richter]: I did.

"[The Prosecutor]: And did he submit to a breath test?

"[Richter]: No.

"[The Prosecutor]: Why is that?

"[Richter]: He refused."

[5] Notably, when the state objected to these questions, the defendant did not defend his right to ask these questions on the ground that he raises on appeal.

[6] The majority's assumption ignores the court's instruction to the jury as to the testimony of an expert witness. The court instructed the jury: "*An expert witness may state an opinion in response to a hypothetical question, and some experts have done so in this case.* A hypothetical question is one in which the witness is asked to assume that certain facts are true and to give an opinion based on those assumptions. The value of the opinion given by an expert in response to a hypothetical question depends upon the relevance, validity, and completeness of the facts he was asked to assume. The weight that you give to the opinion of an expert will depend on whether you find that the facts assumed were proved and whether the facts relied upon in reaching the opinion were complete or whether material facts were omitted or not considered. Like all other evidence, an expert's answer to a hypothetical question may be accepted or rejected in whole or in part according to your best judgment." (Emphasis added.) These instructions contradict any assumption that the jury would accept the expert's testimony as to a hypothetical as "conclusive" of the defendant's blood alcohol level.

[7] The court instructed the jury: "Element two, under the influence. The second element is that at the time the defendant operated the motor vehicle, he was under the influence of intoxicating liquor. A person is under the influence of intoxicating liquor when, as a result of drinking such beverage, that person's mental, physical, or nervous processes have become so affected that he lacks to an appreciable degree the ability to function properly in relation to the operation of his motor vehicle.

"The person's physical or mental capabilities must have been impaired to such a degree that he no longer had the ability to drive a vehicle with the caution characteristic of a sober person of ordinary prudence under the same or similar circumstances. If you find that the defendant was operating a vehicle under the influence of an intoxicating liquor, it is no defense that there was some other cause that also tended to impair the defendant's ability to exercise the required caution. Evidence of the manner in which a vehicle was operated is not determinative of whether the defendant was operating the vehicle under the influence of an intoxicating beverage. It is, however, a factor to be considered in light of all the prudent surrounding circumstances in deciding whether the defendant was or was not under the influence.

"In this case, there has been testimony that the defendant was asked and did agree to perform certain acts which are commonly called field—field sobriety tests. It is up to you to decide if those tests give any reliable indication of whether or not the defendant's capacity to operate a motor

vehicle safely was impaired to such a degree that he no longer had the ability to drive a motor vehicle with caution characteristic of a sober person of ordinary prudence under the same or similar circumstances, or whether they have any rational connection to operating a motor vehicle safely.

"In judging the defendant's performance of those tests, you may consider the circumstances under which they were given, the defendant's physical condition, the defendant's state of mind, and other factors you may deem relevant. Further, in evaluating his testimony, you should consider whether proper instructions and directions were given by the officer to the defendant prior to the commencement of the test, the observations made during the test, and use your common experience in determining whether the defendant was under the influence of intoxicating liquor as I have defined it for you.

"The horizontal gaze nystagmus test is a scientific test. The standardized field sobriety test known as the walk and turn and the one leg stand are not scientific tests, and you should not consider them as scientific tests. You may, however, consider the police officer's observations of the defendant while such tests were being performed, and use your common experience in determining the value, if any, of this evidence. Evidence of the defendant's refusal to submit to a breath test has been introduced. If you find the defendant did refuse to submit to such a test, you may make any reasonable inference that follows from that fact. Any inference that you draw must be reasonable and logical and not the result of speculation or conjecture or guessing in accordance with my earlier instruction to you regarding inferences. To be clear, the state does not have to prove refusal as an element of the offense of operating under the influence, but if you find that there was a refusal you are permitted to draw inferences in accordance with my earlier instructions regarding inferences. The law does not require that you draw any inference, but rather permits you to do so. Evidence of a refusal by itself cannot support a guilty verdict."

[8] In an attempt to rebut this point, the majority asserts in footnote 13 of its opinion that the court did not "expressly [direct] the jury that it could rely on 'only' behavioral evidence . . . ." Certainly, no such limiting instruction was given because no evidence of the defendant's blood alcohol level was introduced at trial. Instead, the court properly instructed the jury based on the evidence it could consider in reaching an ultimate conclusion.

———————————————